# WASHINGTON MARKET COMPANY *v.* DISTRICT OF COLUMBIA.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 83. Argued December 9, 12, 1898. — Decided January 3, 1899.

In the provision in the 16th section of the act of May 20, 1870, c. 108, " to incorporate the Washington Market Company," that " the city government of Washington shall have the right to hold and use, under such

rules and regulations as the said corporation may prescribe, the open space at the intersection of Ohio and Louisiana avenues with Tenth and Twelfth streets as a market," etc., the words "the said corporation" refer to the city government of Washington, and not to the Market Company.

The correspondence between the Market Company and the city government respecting the use and improvement of this tract which is printed below as a note to the statement of the case, creates no easement in the tract in favor of the Market Company; and the company recognized the fact that Congress might lawfully dispossess it from the use and occupancy of it.

THE Washington Market Company was incorporated by act of Congress, approved May 20, 1870. 16 Stat. 124, c. 108. Authority was conferred upon the company to construct suitable buildings and operate a public market on the site of the "Centre Market Space," situated in the northwest section of the city of Washington, between Seventh and Ninth streets and B street and Pennsylvania and Louisiana avenues. With the exception of the sixteenth section, the provisions of the statute related solely to the public market thus authorized and the operation and duration of the franchise.

The sixteenth section is as follows:

"SEC. 16. *And be it further enacted*, That the city government of Washington shall have the right to hold and use, under such rules and regulations as the said corporation may prescribe, the open space at the intersection of Ohio and Louisiana avenues with Tenth and Twelfth streets as a market for the purchase and sale of the following articles, to wit: Hay, straw, oats, corn, corn-meal, seed of all kinds, wood for sale from the wagon, cattle on the hoof, swine on the hoof, country produce sold in quantities from the wagon, and such other bulky and coarse articles as the said corporation may designate. And from and after sixty days from the passage of this act marketing of the products named herein shall be excluded from Pennsylvania and Louisiana avenues and the sidewalks and pavements thereon."

The present litigation was begun on January 17, 1892, by the filing on behalf of the Washington Market Company of a bill in the Supreme Court of the District, the defendant

named therein being the District of Columbia. The bill averred that the complainant was vested by the section above quoted with authority to establish the rules and regulations therein referred to for the government of the wholesale market authorized to be established. It was also averred that under authority of what was claimed to be a contract arising from correspondence had with the District, complainant, in 1871, entered into possession of a part of the open market space referred to in said section 16, and, in 1886, of the entire space. The correspondence relied on is set out in the margin.[1] It

---

[1] WASHINGTON MARKET COMPANY, *November* 8, 1871.

Hon. Henry D. Cooke, Governor of the District of Columbia.

SIR: In section 16 of the charter of this company of May 20, 1870, the open space at the intersection of Ohio and Louisiana avenues with Tenth and Twelfth streets is assigned as a market for cattle and bulky and coarse articles to be sold in quantities from the wagon, and the marketing of such products in Pennsylvania and Louisiana avenues is prohibited.

Notwithstanding this prohibition dealers are continuing to occupy Louisiana avenue in defiance of law and to the great injury of property holders on that avenue. This company has been unable to enforce the prohibition because the open space above referred to has not been properly prepared to enable dealers to occupy the grounds for market purposes as provided in the law.

By the act of Congress the Washington Market Company is entitled to establish the rules and regulations which shall govern the market upon the open space, but it is a question whether or not it was the intention of Congress that this company should derive any income therefrom.

Under these circumstances, to meet a pressing public necessity, this company purposes, with your permission, properly to grade the grounds and to place thereon suitable platforms of inexpensive construction, which will enable the marketmen to do business on the open space as contemplated by the act, charging them for the use of their stands such sums as you and the District authorities may prescribe not to exceed the interest on the actual outlay and the actual expenditures for keeping the market in order.

There can be no possible objection to this course of action, and we trust you will give it your approval at once, as there is a necessity for immediate action.

We have the honor to be, very respectfully,

T. C. CONNELLY,
HALLETT KILBOURN,
ADOLF CLUSS,
WM. E. CHANDLER,
*Committee of the Washington Market Company.*

Statement of the Case.

was alleged that the complainant graded the grounds and
made valuable structures thereon; that it had operated and
was still operating a wholesale market thereon, and that it
had received and was receiving the sources of revenue men-

---

Approved, subject to such regulations as the Legislative Assembly may
hereafter prescribe.   H. D. Cooke, Governor.

WASHINGTON MARKET COMPANY, *April* 8, 1872.
To the Governor and Board of Public Works of the District of Columbia:

The Washington Market Company is now in possession of the open space
at the intersection of Ohio and Louisiana avenues with Tenth and Twelfth
streets, in accordance with the sixteenth section of the act of Congress of
May 20, 1870, and the agreement made with the Governor of the District,
as per agreement of November 8, 1871, as follows.

(Here follows a copy of the letter and approval printed above.)

Since taking possession of the open space thus assigned for a whole-
sale market the company have purchased from the District authorities
the buildings thereon belonging to the city of Washington; have suitably
graded the surface, and have also commenced the erection of structures
thereon necessary for wholesale market purposes, having already completed
an open market or platform shed on the north side of B street over 200 feet
long; also an open platform shed 200 feet long on the north side of the
grounds, with eating-house and storehouses, and have in addition made
arrangements to erect a large open building for loads of hay, grain and
wood, and suitable stables, pens and cattle yards, as soon as the concrete
paving company, now occupying the western portion of said ground, shall
vacate the same; all to be done to the satisfaction of the District authori-
ties, and in such manner as to furnish creditable accommodations for a
wholesale market.

In order to more effectually carry out the foregoing arrangement, entered
into November 8, 1871, the company now propose to the Governor and to
the Board of Public Works, which by law has control of the streets and
avenues of the District, that the said company shall be allowed to collect
of dealers in said wholesale market the following sums:

|  | Amount per day. |
|---|---:|
| Each one-horse team | $0.10 |
| Each two-horse team | 15 |
| Each three-horse team | 20 |
| Each four-horse team | 25 |
| Each head of neat cattle | 20 |
| Each cow and calf | 25 |
| Each swine | 05 |
| Each sheep | 05 |

The Market Company also to charge such reasonable rent for storage as
may be agreed upon with the parties using their buildings.

tioned in the alleged contract, except as to certain charges which it was averred defendant had wrongfully abolished.

It was charged that not only by the abolition of tolls, above referred to, but by other acts of interference by the District and also by recent public assertions of an exclusive right to possess and regulate said market, the receipts from the operation of the same had been greatly diminished, so that the expenses of maintaining the market had been largely in excess of the sum received from its operation. It was prayed that an account might be taken and the District decreed to pay the losses occasioned by it; that the District might also be restrained from prescribing or attempting to prescribe rules and regulations for said market, from interfering with the sources of revenue mentioned in the contract, and from forcibly ousting or resorting to legal proceedings to ob-

---

The company will also keep an office open at all hours of the day and night for the accommodation of dealers, where produce can be measured and weighed, and will furnish suitable watchmen to take charge of the market and collect the revenues thereof.

From the revenues collected the Market Company will retain sufficient to pay all expenses of managing and keeping in repair and good condition the buildings and grounds, with ten per cent annually on the cost of improvements, (which are to be made at the company's charge,) and the company shall pay over to the District authorities the residue or balance of the revenue by them collected.

If by authority of Congress the company should at any time be dispossessed of the use and occupancy of the market grounds, it shall be entitled to receive a fair compensation for its buildings and improvements thereon.

WASHINGTON MARKET COMPANY,<br>By M. G. EMERY, <em>President.</em>

BOARD OF PUBLIC WORKS, DISTRICT OF COLUMBIA,
WASHINGTON, <em>April</em> 26, 1874.

The Washington Market Company:

In reply to your communication of April 8, 1872, I have to inform you that the Board have this day passed the following vote : " To approve the arrangement with the Washington Market Company, proposed in the company's letter of April 8, 1872, relative to the open space at the intersection of Ohio and Louisiana avenues and Tenth and Twelfth streets, used as a wholesale market; this arrangement not to prejudice any lawful future action of the Board, of the Legislative Assembly or of Congress."

Very respectfully,<br>ALEX. R. SHEPHERD, <em>Vice President.</em>

tain possession of the premises. General relief was also prayed.

The answer of the District asserted the invalidity of the alleged contract; averred that the District alone was entitled to occupy said market space and to establish rules and regulations respecting the conduct of the market; and further averred the legality of any action taken by or on its behalf respecting said market space and the tolls imposed in the operation of the market.

The court entered a decree dismissing the bill; and, on appeal, its action was affirmed by the Court of Appeals of the District. (6 App. Cas. D. C. 34.) An appeal was then taken to this court.

*Mr. William Birney* for appellant.

*Mr. S. T. Thomas* for appellee. *Mr. A. B. Duvall* was on his brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

It is difficult to determine precisely the theory upon which appellant predicates its right to relief at the hands of a court of equity. In the bill what is termed a " title to possession " of the market grounds is asserted to be in complainant, and its right not only to prescribe rules and regulations with respect to the market is averred, but also a right to the sources of revenue mentioned in the alleged contract. Despite, however, the position thus taken in the pleadings, and the fact that the complainant demanded that the District be compelled to account for the losses which it is alleged the complainant had sustained by claimed wrongful interferences of the District, counsel, in the argument at bar, bases the right to relief solely upon the prayer for general relief contained in the bill. In consequence of this abandonment of the specific grounds stated in the bill, the argument at bar is that whilst the Market Company, under the section above referred to, had not

obtained a general power to regulate and control the market, it was by said section vested with the power to locate and assign stands therein, and that the facts averred and shown by the proofs established an implied contract, by which the District constituted the company an agent to manage and control the market and collect and disburse the revenues therefrom. And, it is then argued, that from these facts such a situation resulted as that it would be inequitable to permit the District to interfere in any wise with the possession, control and management of the market, without antecedently "reimbursing appellant for moneys expended as its agent in the administration of the wholesale market of Washington city."

Disregarding the fact that the claims asserted in the pleadings on the one hand and at bar on the other are divergent, we shall examine the contentions urged in the order in which they have been made.

*As to the claim that the Market Company is the corporation empowered by section 16 of the charter to establish rules and regulations with respect to the market therein authorized.*

We do not find in the text of the statute anything justifying a construction of the words "rules and regulations" as employed in section 16, which would attach to them a less broad signification than is given to the word "regulations" in the second section, in which section, with reference to the public market authorized to be constructed and maintained by the Washington Market Company, it was provided that "the municipal government of said city shall at all times have the power to make and enforce such regulations with regard to said market and the management thereof as in their judgment the convenience, health and safety of the community may require." The fact that the power to establish and enforce regulations with respect to the market to be erected by the Market Company was vested in the municipality, and the further fact that a voice in the establishment of the amount of rent to be paid for stalls in the market of the company was expressly conferred upon the District authorities, prevents the inference that, with reference to the market which the city itself was "to hold and use," the city was deprived

of the power to make rules and regulations, or that a broad and comprehensive authority to establish such rules and regulations was vested in the Market Company. The grammatical structure of the sentence also supports the view that the corporation referred to in the sixteenth section was the city government, for the nearest antecedent to the word "corporation" is the city government of Washington, the Market Company not being named at all in the section.

*As respects the alleged contract stated in the bill to have been initiated in 1871 and perfected in 1874.*

By the written proposal concerning the use and occupancy of the open market space, bearing date November 8, 1871, addressed to the Governor of the District, the Washington Market Company stated: "This company proposes, with your permission, properly to grade the grounds and to place thereon suitable platforms of inexpensive construction, which will enable the marketmen to do business on the open space as contemplated by the act, charging them for the use of their stands such sums as you and the District authorities may prescribe, not to exceed the interest on the actual outlay and the actual expenditures for keeping the market in order." And it was added: "There can be no possible objection to this course." Upon this letter was placed the following indorsement: "Approved, subject to such regulations as the Legislative Assembly may hereafter prescribe. H. D. Cooke, Governor."

Irrespective of what may have been the power possessed by the Governor concerning the market grounds or market, it is clear that there is nothing in this proposal of the Market Company, or in the qualified approval of the Governor importing a surrender by the Legislative Assembly of any rights which by law were vested in it, such as the power to establish and alter at pleasure the rules and regulations with respect to the manner of occupancy and the tolls to be exacted for the use of stands. Certainly no easement was attempted to be created in favor of the Market Company in the land; at most, there was a mere revocable license to hold and use the grounds. So, also, the language of the communication was carefully

framed to permit no inference that the District would incur any pecuniary liability for the cost of grading or the erection of the "inexpensive" platforms. The Market Company was evidently interested in the placing of the grounds in suitable condition for occupancy by dealers, and was willing to assume the risk of making expenditures, in reliance upon fair treatment and good faith on the part of the District authorities.

The communication of April 8, 1872, evidenced the fact that the Market Company had gone into possession of the grounds, had graded the surface and erected two platforms, one of which contained an eating-house and storehouses. The company solicited authority to collect certain tolls and charges, including storage fees, and agreed to keep an office upon the grounds and furnish suitable watchmen, and after applying the revenues to the expenses of management and keeping in repair and good condition the grounds, with ten per cent annually on the cost of improvements, promised to pay over the balance of revenue, if any, to the District. That the company did not consider itself in the light of an agent or employé of the city in making improvements on the grounds, is shown in the communication. Thus, the buildings for the use of which it solicited authority to charge storage rent are referred to as "their" buildings. It is expressly stated in connection with the stipulation that the company might retain from the revenue ten per cent annually on the cost of improvements, that such improvements were "to be made at the company's charge;" and it is also stated that the company should be entitled to receive a fair compensation for "its" buildings and improvements on the market grounds, if by authority of Congress the company should at any time be dispossessed of the use and occupancy of the grounds. While this latter arrangement is said to have been orally acquiesced in, it was not until April 6, 1874, that formal official action was taken approving the same, with the proviso, however, that the arrangement was "not to prejudice any lawful future action of the Board, of the Legislative Assembly or of Congress."

Assuming that authority was vested in the Governor and

Board of Public Works to enter into the arrangement suggested in the second proposition of the company, it is clear that thereby no easement was created in the land in favor of the Market Company, and the company recognized the fact that Congress might lawfully dispossess the Market Company from the use and occupancy of the grounds. The qualified acceptance of the proposal at most only constituted an implied assurance on the part of the Governor and Board of Public Works that the company, so far as those officials had the power, would not be disturbed in its possession without just cause. There was no agreement that a source of revenue would be supplied adequate to meet the expenditures, or that the District assumed liability for any deficit in the revenue. If, however, the correspondence and action taken thereon could be construed as importing an agreement to impose a pecuniary liability on the District, an inspection of the terms of the organic act of February 21, 1871, c. 62, 16 Stat. 419, providing a government for the District of Columbia, clearly establishes that it was without the power of the officials undertaking to enter into the arrangement. The making of regulations with respect to the use of the market grounds and the establishment of a tariff of charges with the power to subsequently alter or abolish the same, and the authority to incur a pecuniary liability with respect to the improvement of the market grounds, the erection of market buildings and the operation of the market, were beyond question within the province of the Legislative Assembly, and any assumption on the part of the Governor, either with or without the sanction of the Board of Public Works, of authority to conclude the Legislative Assembly in such matters, would have been purely *ultra vires.*

There was nothing in the conduct of the District subsequent to 1874 which, if it possessed the power, could be construed as a ratification of the alleged contract or as importing binding efficacy upon the District. There was certainly no recognition of the Market Company as a mere employé making expenditures and disbursing revenues solely as the agent of a principal, and the District authorities were never notified that the

Market Company would look to it for repayment of any deficit in revenues. So long as the company was willing to care for the grounds and to operate the market, while the annual revenues were less than the ordinary expenses of management, as appears to have been the case, without calling upon the District to assume the responsibility for a deficit, there was no occasion for the District to take decisive action. The furnishing of accounts, beginning with 1888, possesses no weight, as manifestly the District was interested in the ascertainment of the fact whether or not there was any surplus revenue to which it was entitled.

The facts in the case at bar bear no analogy to those which were present in the cases referred to in Pomeroy's Equity Jurisprudence,[1] (Vol. 1, sec. 390,) to which our attention has been directed by counsel for the appellant. There individuals, acting on the supposition that they had a title to or interest in lands, expended money in erecting buildings or other improvements thereon, while the real owner stood by and made no protest. No ground exists for the pretence that such was the case here. A court of equity will not relieve an individual from the operation of the Statute of Frauds which requires that interest in lands be created by an instrument of writing, and impose an equitable lien upon land in favor of one who makes improvements thereon, knowing that the title is in another, especially where the money is expended under an express understanding with reference thereto had with the owner, but will leave the party to the remedies, if any, which a court of law provides.

These views dispose of the case and require an affirmance of the decree of the Court of Appeals of the District of Columbia.

*Decree affirmed.*

---

[1] *Powell* v. *Thomas*, 6 Hare, 300; *Ramsden* v. *Dyson*, L. R. 1 H. L. 129.