FLEMING-GILCHRIST CONSTRUCTION COMPANY ET AL., Appellants, v. LOUISE MCGONIGLE, Administratrix.

FLEMING-GILCHRIST CONSTRUCTION COMPANY, Appellant, v. A. J. MOORE ET AL., Defendants, LOUISE MCGONIGLE, Administratrix, Respondent.

FLEMING-GILCHRIST CONSTRUCTION COMPANY, Plaintiff, CONCRETE ENGINEERING COMPANY ET AL., Appellants, v. A. J. MOORE ET AL., Defendants, LOUISE MCGONIGLE, Administratrix, Respondent.

FLEMING-GILCHRIST CONSTRUCTION COMPANY, Plaintiff, CONCRETE ENGINEERING COMPANY ET AL., Appellants, v. A. J. MOORE ET AL., Defendants, LOUISE MCGONIGLE, Administratrix, Respondent.—89 S. W. (2d) 15.

Division One, December 18, 1935.

*Goodwin Creason, McClintock & Quant, Wright, Rogers & Margolin, Harding, Murphy & Tucker, John M. Cleary, Raymond Barnett, James A. Reed, Joseph F. Keirnan, James P. Aylward, James G. Smart, George K. Brasher, Ryland, Stinson, Mag & Thompson, Walter Raymond, C. A. Capron, Maurice O'Sullivan* and *August F. Behrendt* for appellants.

58

*Johnson, Lucas, Landon, Graves & Fane, W. R. Moore* and *A. N. Adams* for respondent.

HYDE, C.—This is an action in equity brought by a mechanic's lien claimant, under authority of Section 3180, Revised Statutes 1929, to establish a lien, in the sum of $103,394.97, upon certain real estate in Kansas City, and to determine the priorities between plaintiff's lien and other mechanics' liens, and the mortgage thereon. The court entered a decree which adjudged the mortgage to be a first lien on the land, and all mechanics' liens to be first liens of equal priority upon the improvements erected thereon, and ordered these improvements sold separately from the land. All mechanics' lien claimants have appealed from this decree.

Plaintiff was the contractor that commenced the construction of the improvements on the land. The liens of fifteen other claimants, who were defendants in this action, were for material furnished or work done upon these improvements, which were planned to be an' eleven-story apartment hotel building, with separate garage, to be called the "Chief." The construction of the Chief building was commenced about May 1, 1929, on lots located at the southwest corner of the intersection of Central Street and Armour Boulevard. At this time there was a mortgage of $150,000 upon the property which had been executed November 17, 1925, and which matured November 17, 1930. The note secured by this mortgage became the property of D. S. McGonigle after the construction of the Chief building had commenced. He has since died and his administratrix, who has been substituted herein, will hereinafter be referred to as the respondent. All mechanics' lien claimants proved the accounts upon which they based their liens, and these liens in the aggregate amounted to a

greater sum than was due upon the mortgage. The only controversy in this case, upon the appeal from the decree of the trial court, is between the mechanics' lien claimants and respondent as to how the property should be sold and as to how the proceeds therefrom should be applied as between the mechanics' liens and the mortgage debt.

. The construction of the Chief building was begun by plaintiff under a contract with John H. and J. W. Kelley, which provided that the Kelleys employed plaintiff "to build and erect (furnishing labor, materials and machinery to work with) to complete the excavation and the reinforced concrete framework of the 2-unit, 11-story Apartment Hotel Building known as the 'Chief.' " The Kelleys did not, at that time, have the record title to the land upon which the Chief building was to be constructed, the title thereto being in Annie J. Moore, the mother-in-law of J. W. Kelley. The Kelleys, however, claimed to have held an unrecorded deed to the property from her for. the benefit of the Kelley Development Company, a Missouri corporation, the stock of which had been issued to them and Mrs. Moore. It was shown that this stock had been pledged to a Kansas City bank, as collateral for a loan, prior to the "Chief" building operations. It was intended by the Kelleys to complete the Chief building in accordance with plans drawn by their architect at an estimated total cost of $595,000. Apparently they entered into the contract with plaintiff for the foundation and framework without having arranged for financing to pay for it or to complete such a building. Work on the Chief building stopped about the 17th of October, 1929, because the Kelleys produced no money. Plaintiff had then almost completed the concrete framework which it contracted to build. Plaintiff's testimony showed that "the structure as it now stands consists of the concrete framework;" that "the concrete floors are all laid and cement finished top on in all the space;" that "the brick work is up approximately two stories, together with part of the terra cotta window frames;" and that "there is considerable plumbing and electric wiring roughed in." The brick work was done by the Kelleys independently of plaintiff's work. Plumbing, wiring and other work was done by other mechanics' lien claimants. It was also shown that there were no partitions built into the building, no interior finish of any kind, no elevators installed, and no roof on; but that the concrete part of the main roof had been poured, except the pent house roof, which was not completed because the Kelleys had not completed the brick work upon which it was to rest. Upon other lots covered by the mortgage and to the west of the Chief building (the record title to which was also in Mrs. Moore), there was also a five-story apartment building known as the Best Apartments, which had been completed and occupied for some time prior to the Kelleys' building operations.

The court's decree adjudged that respondent's mortgage, upon which was due the sum of $179,463.10, was the first lien on all of the land "exclusive of the Chief building;" that this mortgage was also "a lien on said building known as the 'Chief,' subject to the liens herein on said Chief Hotel in favor of the mechanics' lien claimants;" that plaintiff and the other mechanics' lien claimants have first mechanics' liens equal with each other "against the partially constructed building thereon known as the 'Chief;'" and that they also had liens upon the land covered by the mortgage "other than said Chief building subject only to the lien of the taxes thereon and the lien of said deed of trust." The court ordered that the mortgage be foreclosed by the sale of the property by a special commissioner appointed by the court.

The decree provided for the sale of the property and the application of the proceeds, as follows:

"Before offering any of said property for sale, said special commissioner shall announce that the bids to be taken will be contingent and retained until all bids are in, and at said sale, said special commissioner shall first offer for sale said lots and all improvements thereon in parcels as follows, and in the following order, to-wit:

"1. Said Lots 20, 21 and 22 (except the east 25 feet thereof), all in Block 7, in Hyde Park, an addition or subdivision in Kansas City, Kaw Township, Jackson County, Missouri, together with all improvements thereon. (The lots on which the "Best Apartment Building" was located.)

"2. Said Lots 1, 2, 3, 4 and the east 25 feet of said lots 20, 21 and 22, all in Block 7, in Hyde Park, an addition or subdivision in Kansas City, Kaw Township, Jackson County, Missouri, exclusive of the said Chief Building. (The lots on which the "Chief" was constructed.)

"3. All of Lots 1, 2, 3, 4, 20, 21 and 22, all in Block 7, in Hyde Park, an addition or subdivision in Kansas City, Kaw Township, Jackson County, Missouri, together with all improvements thereon, except the Chief Building. (All of the lots covered by the mortgage.)

"4. The Chief Building separately from any and all of said real estate.

"When all of said properties or parcels have been offered for sale as aforesaid, the special commissioner shall announce that any bidder may increase his or its bid on any parcel, or may bid on any parcel on which he or it had not formerly bid; and when such bids, if any, are made, said special commissioner shall declare said bids closed, and shall declare each of said parcels and all of said improvements sold, respectively, to the bidder or bidders who have offered the highest bid or bids, respectively, on such of said parcels as constitute the whole of said lots and all improvements thereon to

the highest bidders under said separate offers 1, 2 and 4, unless the highest bid under offer 3 shall exceed the total of the highest bids received under offers 1 and 2; in which latter event, then, to the highest bidders under said separate offers 3 and 4.

''Said sale of all of said lots and improvements thereon shall be free and clear of all rights, titles, interests, claims and liens of each and all of said parties hereto, and all persons claiming under, by, or through them, or any of them, in and to any and all of the said lands and any and all improvements thereon, but subject to the liens for taxes and special assessments against said property.

''The proceeds received from the sale or sales of all of the aforesaid lots and all improvements thereon, except the Chief Building, if the same be approved by the court, shall first be applied pro rata with the sale price of said Chief Building, to the payment of the costs of this cause; next, if any balance, to the payment of the judgment herein in favor of D. S. McGonigle, foreclosing said deed of trust; next, the balance, if any, to be first applied pro rata to the payment of the mechanics' lien judgments herein in favor of the plaintiff and the intervening mechanics' lien claimants herein, as herein provided; and the balance, if any, after making such payments, shall be paid to the defendant, E. L. Foutch, as trustee in bankruptcy of Kelley Development Company, bankrupt.'' (The proceeds of the sale of the Chief building, less costs, were ordered pro rated between plaintiff and the other mechanics' lien claimants.)

Within four days after the court's decree was entered, plaintiff and the other mechanics' lien claimants filed motions to set aside the decree and to permit them to offer proof that the reasonable market value of all of the land exclusive of the Chief building was $150,000; that the value of the land upon which the Chief building was built was $45,000; that the value of Lot 4 behind the Chief building, $5000; that the value of the rest of the land, including the Best Apartments, $100,000; and that the Chief building if sold together with the land would add materially to the value thereof. It was alleged in these motions that the property should be sold as two distinct properties, namely: The Chief building property and the Best Apartment property; that it would cost from $15,000 to $20,000 to remove the Chief building from the land; that there would be no value or salvage in the same; but that the present value of the Chief building if it remained on the land was $135,000; and that it added at least that much to the value of the property. The court was requested to enter another decree which would fix the value of land and the Chief building; which would provide for a sale of the Chief building with the property, instead of separate therefrom; and which would order that the proceeds be pro rated between the mortgage debt and mechanics' liens in proportion to the value of the land and building

as thus determined. Motions were also filed to modify the decree and for a new trial. The court overruled all of these motions, and plaintiff and the other mechanics' lien claimants appealed from its decree. This appeal is docketed as No. 32194.

Appellants' contention is that Sections 3180-81-82 and 3183, Revised Statutes 1929, authorize such a sale of the Chief building, with the land upon which it stands, and the distribution of the proceeds thereof between the mechanics' liens and the mortgage debt in proportion to the respective values of the Chief building and the land to the whole property. They do not contend that our mechanics' lien statutes prescribe such a method of sale and distribution but argue this is true because these sections provide for an action in equity to determine and enforce liens. They say that a court of equity derives from its general equity jurisdiction the authority to sell the property and divide up the proceeds between the parties in whatever manner it may deem to be right and just between the parties; and that the method which they urge would be equitable. Appellants say that, in providing for an action in equity to determine and enforce the rights of all parties interested in property subject to mechanics' liens, "it was the purpose and intention of the legislators that the chancery court in such equitable proceeding should do what a chancery court having jurisdiction would do absent any such direction from the statute;" and that "independent of any statute a chancery court where it has jurisdiction will grant such relief as in equity is just and proper."

The trouble with all this is that a court of equity cannot create rights but is limited to determining what rights the parties have, and whether or in what manner it is just and proper to enforce them, and that the right to acquire and enforce a mechanics' lien is a privilege which is created by and dependent upon statute. Mechanics' liens were neither recognized at common law nor allowed in equity and, therefore, the determination of such lien claimants' rights involves almost exclusively the construction of statutes. [18 R. C. L. 872, sec. 1; 40 C. J. 42 and 64, secs. 3 and 30; 62 L. R. A. 369, note; L. R. A. 1917C, 1119, note; Rockel on Mechanics' Liens, 1, secs. 1 and 2; Bloom's Law of Mechanics' Liens, 4, sec. 4; Henry & Coatsworth Co. v. Evans, 97 Mo. 47, 10 S. W. 868, 3 L. R. A. 332; South Fork Canal Co. v. Gordon, 6 Wall. 561, 18 L. Ed. 894; Houston Lumber Co. v. Hunt, 96 Kan. 778, 153 Pac. 554; Boyle v. Mountain Key Min. Co., 9 N. M. 237, 50 Pac. 347; Feuchtenberger v. Williamson, 137 Va. 578, 120 S. E. 257; Ward v. Yarnelle, 173 Ind. 535, 91 N. E. 7.] As late as 1909, it is said by Rockel (citation, supra) that Great Britain had no such laws, and that, while such a lien "may rest largely upon an equitable basis, yet, without a statute, the broad principles of equity would not reach it." Such liens were recognized

under the civil law and were, in France, provided for by the Code Napoleon. It is interesting to note that the first Mechanics' Lien Act in America was passed in 1791 by the General Assembly of Maryland at the solicitation of Thomas, Jefferson and James Madison, who urged such legislation as a means to encourage the rapid building of the new city of Washington. [See citations in Bloom and Rockel, supra.] This example has since been followed by every state in the United States, as well as by the Canadian provinces, but claimants' rights and remedies thereunder vary widely and only cases which construe statutes like ours could be of any aid in a case such as this. (For a discussion of statutes and decisions of various states, see University of Missouri Bulletin, 48 Law Series 5.) As said by the Virginia court, in the Feuchtenberger case, supra: "Neither the conscience of the chancellor, nor the length of his foot can supplement the statute, and vest the court with any jurisdiction except that which is based upon the statute." It is, therefore, clear that unless appellants have been given the rights to have and to enforce mechanics' liens, to the extent and in the manner they claim, by some statute of this State, then they do not have any such rights and no court, of either law or equity, can create them.

Commenting on the sections which provide for an action in equity to determine and enforce the rights of all parties interested in property upon which mechanics' liens are claimed, and which are the only statutes upon which appellants claim the right to sell all the property and pro rate with the mortgage, the Kansas City Court of Appeals, in Gold Lumber Co. v. Baker, 36 S. W. (2d) 130, 1. c. 132, said:

"These sections do not, by their terms, affect substantive rights, but relate entirely to procedure, prescribe the manner and method for the speedy determination in one action of the priority of all liens and other interests in property which is the subject of liens."

It certainly is apparent from a careful consideration of these sections that they create no new substantive rights but instead provide for a better method of enforcing such substantive rights as had already been given by other sections. The sale of the property as a whole, the determination of the proportionate values of land and buildings, and the pro rata distribution of proceeds between lien claimants and mortgages, is not provided for by these or any other sections of our mechanics' lien law. It is true that these sections do provide for the exercise of the powers of equity in marshaling assets, in applying and distributing proceeds, and in determining priorities, but these powers must be exercised in accordance with the legal rights given to the parties by the mechanics' lien laws and other laws or in accordance with equitable rights arising out of their dealings with each other. Marshaling assets means the protection of

the rights of junior lien holders (or of the debtor), in situations where all of the liens do not cover the same property and where a sale of part of the property may substantially reduce a prior lien, by requiring part of the property to be sold and the proceeds applied to reduce the amount of the prior lien, before selling the rest of the property or before selling the only property which secures junior liens (or which may be saved for the debtor). [18 C. J. 454, sec. 2; 38 C. J. 1365, sec. 2.] That is what the court did by its decree herein when it ordered the Best Apartment property to be first sold, and appellants suggest no better way of marshaling assets and applying the proceeds of separate sales thereof to the mortgage than the method adopted by the court.

The Legislature of this State has attempted to construct our mechanics' lien statutes upon broad principles of right and justice, and this court has applied equitable principles in giving them liberal construction to carry out their remedial purposes, but mortgages are either put entirely ahead of or entirely behind mechanics' liens and there are no provisions for pro rating between them. Under Section 3163, Revised Statutes 1929, mechanics' liens are given priority over all mortgages made subsequent to the commencement of buildings or improvements upon land. This court has liberally construed this statute, by applying what is called the first spade rule, namely:

"All mechanics' liens commence at the date of the first stroke of the axe or spade, and continue in the erection of the house, without regard to the time of their being filed, or of the doing of the work or furnishing the materials. . . . It 'works no injustice to any one dealing with the property, as the work itself is notice to all of the mechanics' claims. It enables them by ocular examination to ascertain whether they can do so (buy or take a mortgage) safely.' " [Schroeter Bros. Hdw. Co. v. Croatian "Sokol" G. Assn., 332 Mo. 440, 58 S. W. (2d) l. c. 1003.]

When it comes to building upon property which is already covered by an existing mortgage, the Legislature has not seen fit to attempt to disturb the priority of such mortgage or to prevent its foreclosure but has given, to those who furnish labor or material, rights and remedies in completely new improvements on the premises, by Section 3159, Revised Statutes 1929, which provides:

"The lien for the things aforesaid, or work, shall attach to the buildings, erections or improvements for which they were furnished or the work was done, in preference to any prior lien or encumbrance or mortgage upon the land upon which said buildings, erections, improvements or machinery have been erected or put; and any person enforcing such lien may have such buildings, erections or improvements sold under execution, and the purchaser may remove the same within a reasonable time thereafter."

This statute provides the remedy and the only remedy which is given for such a situation. It is, in fact, a departure from the original principle of the mechanics' lien statutes which was that buildings placed upon land become a part thereof and therefore land (which had been improved by labor and material becoming a part thereof) ought to be subjected to a lien for such improvement. This statute prevents the operation of this common-law rule, as between mortgagee and workmen or materialmen, making the building separate property from the land with the right of removal much as is often done by contract between landlord and tenant. Now appellants say that, when improvements are erected which cannot be removed without destroying their value, the right to separately sell the improvements is worthless and they ought to be given another different and additional remedy such as the pro rata valuation and distribution of the proceeds for which they contend. This would neither recognize the common-law rule that the building becomes a part of the land (for if it did the mortgage would be the first lien thereon), nor the statutory rule of preventing the operation of the principle of accession under such circumstances. In view of the mechanics' lien statutes which we now have, it is only necessary for this court to say that the Legislature has not seen fit to give them such a remedy. [See Gold Lumber Co. v. Baker, 225 Mo. App. 849, 36 S. W. (2d) 130; Ambrose Mfg. Co. v. Gapen, 22 Mo. App. 397.] In fact, the Legislature, in the final clause of Section 3159, has recognized that there may be improvements put on land which ought not to be removed, no doubt, because such removal might damage the property and be of little value to anyone, since it specifically provided that the right to removal of improvements should not extend to a sidewalk.

Anyhow, where are the equities in plaintiff's favor which require that new rights and remedies be created for him or that respondent be refused his legal rights? It will be noted that plaintiff's contract here was not to build a completed building but only "to complete the excavation and the reinforced concrete framework." Suppose that only the excavation had been completed. There might be some removable salvage in a sidewalk but there certainly would be none in a hole in the ground. Moreover, the hole might be a great detriment to the property if it was not suitable for any reasonable use to which it could be put. The same thing might be true of a skeleton skyscraper which would require a quarter of a million dollars or more to complete, if there was no reasonable need for such a structure in the community. Such structures could easily be valued so as to pro rate the mortgagee out of most of his security. The proverbial "Tower of Babel," was an incompleted structure which, no doubt, cost a lot of money, but what good would it be to most property owners? The holder of an unmatured mortgage cannot prevent the holder of

the legal title from building. No doubt such practical considerations have caused our Legislature to enact the mechanics' lien remedies which they have provided, and to so far refuse to adopt the remedies which appellants desire. If he desires to deal with one whose financial condition is precarious, without knowing where his money is to come from, ''the mechanic or materialman can protect himself by getting the approval of an owner or mortgagee before he does the work, or by only working upon or furnishing material for removable improvements.'' [Masterson v. Roberts, 336 Mo. 158, 78 S. W. (2d), 856.] Appellants have not pleaded nor offered to prove any facts which would tend to show any acts on the part of the mortgagee here, that would give rise to any equitable rights, which they could urge as proper grounds for preventing him by estoppel or otherwise from enforcing his legal rights. In the present state of the law and under the facts shown (contracting with persons who did not hold the legal title, representing a financially unsound corporation, to build only the frame of a building, which would take a great sum of money to complete, upon lots which were subject to a valid prior recorded mortgage, without requiring the payment of a single cent until their work was completed), we must hold that plaintiff and the other appellants were not entitled to the remedy they sought, and that the trial court's decree must be upheld as reasonable, just and proper.

The other appeals in this case, docketed as No. 32605, No. 32606 and No. 33025, are appeals taken from further orders of the court, after the entry of the decree, which were made concerning the sale of the property. The appeal from the court's decree was without *supersedeas* bond, and the special commissioner, therefore, proceeded to sell the property as directed in said decree. This sale was held March 2, 1932, and D. S. McGonigle, the sole bidder, bought all the land together with the Best Apartments for $170,000, subject to $10,000 taxes thereon. At such sale the Chief building was bid in by plaintiff for $2500. The special commissioner made due report of this sale on the day following, March 3, 1932. Although the decree provided that any mechanics' lien purchaser of the Chief building could apply, on his bid, his lien judgment in the proportion that the same stood to the total mechanics' lien judgments, plaintiff wanted to apply all of its bid on its own lien judgment and offered to pay only costs of the sale. On May 2, 1932, the sale to plaintiff of the Chief building was set aside, and the building ordered resold, because plaintiff refused to so pay its bid in cash. Appeal No. 32605 herein is by plaintiff from that order of May 2, 1932, setting aside the sale to it of the Chief building, and directing that the building be resold separate and apart from the land.

All mechanics' lien claimants, objected to the confirmation of the

sale of the land to respondent of March 2, 1932. These exceptions were overruled and said sale confirmed on March 14, 1932. Appeal No. 32606 is by all said mechanics' lien claimants, except plaintiff, from the order of March 14, 1932, overruling such exceptions.

Pursuant to the order of the circuit court made May 2, 1932, the special commissioner again sold the Chief building, separate and apart from the land. At this second sale, on June 22, 1932, D. S. McGonigle bid $500 for the Chief building, which was duly reported to the court. All mechanics' lien claimants, except plaintiff, filed exceptions to this second sale of the building and asked that it be disapproved. On July 9, 1932, these exceptions and motions were overruled and the sale of the Chief building to D. S. McGonigle for $500 was confirmed. Appeal No. 33025 is an appeal by said mechanics' lien claimants, except plaintiff, from said order of July 9, 1932, overruling their exceptions to and confirming said sale of the Chief building for $500.

The same reasons are urged, for reversing or setting aside these orders, as are argued in the appeal from the court's decree, namely: that equity and justice demands that the Chief building and the land be sold together after their respective values have been fixed and that the proceeds of such sale be thus pro rated. These appeals are necessarily ruled by what we have already said concerning the appeal from the court's decree. It would, of course, be proper for a court, under circumstances such as exist here, provided that it ordered the prior mortgage first paid in full out of the proceeds, to order a sale of land and a new building together as a whole if it seemed that more could be thus realized than if each was sold separately. However, the court could not do so if mechanics' lien claimants insisted on their right to have the building sold separately so as to have their statutory right of removal. Evidently the mechanics' lien claimants here did not feel that the land and building sold together would bring the amount due on the mortgage and did not care to have the land and building sold together as a whole, if the mortgage was to be first paid out of the proceeds. They apparently desired such a sale only in case part of the proceeds would come to them even though the whole property sold for less than the amount of the mortgage. Each of the forms for decree which they submitted to the court provided for a plan of valuation and distribution which would limit the amount of the proceeds to be paid to the mortgagee to less than the full amount due him, and which would give them part of the proceeds without paying the mortgage in full.

The decree and the orders of the court, confirming the sale of the land and building, are affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.