LEE & BOUTELL COMPANY, a Corporation, v. C. A. BROCKETT CEMENT COMPANY, a Corporation, ARTHUR GARNEY, Doing Business as GARNEY PLUMBING & HEATING COMPANY, RUST SASH & DOOR COMPANY, a Corporation, HENRY SEUFERT and CHARLES L. SEUFERT, Copartners, Doing Business as SEUFERT BROS. HARDWARE COMPANY, COOK PAINT & VARNISH COMPANY, a Corporation, UNITED BRICK & TILE COMPANY, a Corporation, HENRY R. LEWIS, WEATHERPROOF PRODUCTS COMPANY, a Corporation, KANSAS CITY LIGHT & FIXTURE COMPANY, a Corporation, HELEN C. JOHNSON, JOHN J. LEWIS and HENRY R. LEWIS, Doing Business as S. C. JOHNSON & SON, E. E. MILLER, BADGER LUMBER & COAL COMPANY, a Corporation, STEWART SAND COMPANY, a Corporation, Respondents, GRANT I. ROSENZWEIG, MATHILDE ROSENZWEIG, and PRUDENTIAL INSURANCE COMPANY OF AMERICA, a Corporation, Appellants.—106 S. W. (2d) 451.

Division Two, June 21, 1937.*

*NOTE: Opinion filed at September Term, 1936, April 21, 1937; motion for rehearing and motion to transfer to Court en Banc filed; motions overruled at May Term, 1937, June 21, 1937.

*Grant I. Rosenzweig, Charles E. McCoy* and *Harry Howard* for Rosenzweigs; *Alfred M. Seddon* of counsel.

*Wilkinson,. Byrum & Gough* and *W. Raleigh Gough* for Prudential Insurance Company of America.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau* and *Claude E. Ferguson* for Henry R. Lewis and C. A. Brockett Cement Company.

*Arthur E. Johnson* and *Goodwin Creason* for Badger Lumber & Coal Company.

*George K. Brasher* for Rust Sash & Door Company, Arthur Garney and Seufert Brothers Hardware Company; *Guy M. Boyer* for Cook Paint & Varnish Company.

*Joseph F. Kierman* for Stewart Sand Company.

*George Horn* for E. E. Miller.

BOHLING, C.—This is an equitable mechanics' lien action involving liens totaling, in principal amounts, $2,117.04 against Lot Three and $8,524.95 against Lot Four (contiguous lots), in Block Twenty-one of Romanelli Gardens, an addition in Kansas City, Jackson County, Missouri, and improvements thereon. The lien claimants (respondents here) prevailed in the trial court, and Grant I. Rosenzweig and Mathilde Rosenzweig, husband and wife, purchasers at the foreclosure under (and theretofore owners of) a first mortgage on Lot Four, and Prudential Insurance Company of America, a corporation, purchaser at the foreclosure under (and theretofore owner of) a first mortgage on Lot Three, appeal.

The J. C. Nichols Investment Company, a corporation (hereinafter designated Nichols for convenience), owned said real estate in October, 1928. On October 22, 1928, said Nichols as "seller" and Fidelity Building Company, a corporation (hereinafter designated Fidelity), as "buyer" entered into a contract in part, reciting: ". . . the seller has sold and agrees to convey as herein provided" said Lots Three and Four "for which the buyer agrees to pay $9,633.30 as follows: $1,578.11 "at the signing of this contract, the receipt of which is hereby acknowledged by the seller. . . ." Fidelity agreed to assign its interest in certain real estate for said credit of $1,578.11. On the delivery of the deed $3,211.10 was to be paid in cash and $4,844.09 in cash or second mortgage paper acceptable to Nichols. The contract further provided that if proper title could not be made ". . . this contract shall become null and void and the deposit made hereunder shall be returned to the buyer. . . ." Nichols received the assignment of the real estate mentioned in said contract and later realized said $1,578.11 out of said real estate. This Nichols-Fidelity contract provided for reservations in the deed concerning the size, cost, etc., of any residence erected on said lot. It, however, was not recorded.

Fidelity's stock was held by Maud Eaton, who owned 98 shares, and R. N. Eaton, her husband, and E. M. Chester, who owned one share each. R. N. Eaton was President and in active charge of the

management of said corporation. The Eatons also owned other property and engaged in building operations on their account at times. The business transactions of the Eatons and Fidelity were interwoven; and it appears that not unfrequently title to Fidelity property was taken in the name of Maud Eaton and at times in the name of other relatives of the Eatons. This practice may have arisen at a time when Fidelity was involved in litigation and for the stated purpose of convenience in the transfer of its title to property pending an appeal from a possible adverse judgment. However, the testimony was that the litigation had been settled long before the execution of the deeds here involved.

On April 5, 1929, work on the construction of improvements on said Lot Four was commenced.

R. N. Eaton instructed Nichols to make the deed to said Lot Four to Maud Eaton. Nichols executed a deed April 18, 1929, recorded April 23, 1929, containing the recital: "The property above described is conveyed subject to any and all claims for labor performed and/or material furnished in the construction of improvements thereon," conveying said Lot Four to said Maud Eaton with covenants of general warranty "except the covenants, restrictions, reservations and exceptions above referred to."

Negotiations for a loan for the erection of a residence on Lot Four were entered into between R. N. Eaton and Fels Real Estate Mortgage Company (now Arthur Fels Bond and Mortgage Company and hereinafter designated Fels), a corporation. Fels previously had transacted business with the Eatons and with Fidelity, considered and treated them as separate entities, and closed the Nichols-Fidelity-Eaton Lot Four transaction but had no information concerning Fidelity in connection therewith. Under date of April 19, 1929, Nichols wrote Fels, transmitting said warranty deed, a note for $2,422.22, secured by deed of trust, and completion bond, and instructed Fels to have the papers properly executed, recorded and returned, but before recording to secure possession of $1,833.78, principal amount, with interest from April 20, for Nichols. Said letter also stated: "We are looking to your company to use the utmost care and caution in the disbursement of your first loan proceeds to determine that the money is actually spent in the payment of bills for labor and materials used in the construction of the improvements erected on the above described property." Maud Eaton and R. N. Eaton, executed a first mortgage on Lot Four and all improvements thereon to Fels, as beneficiary, with Kansas City Title and Trust Company, a corporation, as trustee, to secure their several negotiable promissory notes aggregating $15,000, principal amount, payable to Fels, said deed of trust reciting: ". . . in case this instrument is made in connection with any improvement now in course of erection or projected [grantors], will promptly and fully com-

106

plete, pay for and keep any mechanic's liens from being filed against the same," and for additional security Fels was to be subrogated at its option "to any lien, though released of record, paid out of funds secured by this deed." The deed of trust referred to in the Nichols-Fels letter was executed by Maud Eaton and R. N. Eaton to Samuel D. Newkirk, as trustee, for the benefit of Elizabeth Dieghan, was subject to the Fels $15,000 deed of trust, and secured the note of said grantors to said beneficiary in the principal sum of $2,422. The completion bond referred to in the Nichols-Fels letter was to the effect (as abstracted) that Maud Eaton and R. N. Eaton, "as principals" acknowledged themselves indebted to Elizabeth Dieghan, obligee, in the sum of $30,000, that "whereas the principals have purchased Lot Four, on which they have begun the erection of a residence;" that whereas the obligee procured for said principals said $2,422 loan upon the agreement, among others, of said principals "to build and fully complete" said residence "in accordance with plans and specifications previously submitted to obligee, and to pay all bills for labor and materials used in the construction of said residence, in order that there be no mechanics' liens claims;" and that the same was to be void upon the performance of said conditions by said principals "by November 1, 1929," and the saving of said obligee from all loss and expense. The Eatons also executed a $15,000 completion bond in favor of Fels. Rosenzweigs' brief states these completion bonds are similar; but we note the same language is not used in their abstract of the instruments. The Fels bond was to the effect, as abstracted, that the obligors ". . . have agreed to erect and complete . . ." a residence on Lot Four; and that said obligation was to be void upon said improvements being completed "free and clear of mechanics' liens" and said obligors saving Fels "harmless from any and all mechanics' liens, pertaining to the improvements, and paying "counsel to defend any lien suits", and paying "any and all judgments and costs in any such suit." Fels forwarded the Nichols' papers, and on June 4, 1929, forwarded remittance to Nichols to cover the $1,833.78 mentioned in the Nichols-Fels letter. These instruments bore date of April 20, 1929, and the deed, and the deeds of trust were recorded April 23, 1929.

Transactions with reference to Lot Three followed in general the procedure with reference to Lot Four.

The construction work on Lot Three commenced in June, 1929.

R. N. Eaton negotiated for a loan from the Prudential Insurance Company of America, a corporation (hereinafter designated Prudential), which was represented in the transaction by the Shryock Realty Company (hereinafter designated Shryock). R. N. Eaton instructed Nichols to make the deed to Lot Three to Maud Eaton. Under date of August 9, 1929, Nichols forwarded to Shryock the warranty deed to Lot Three, a blank note for $2,422.09 and second deed of trust

securing same, and a completion bond, with a letter of transmittal. This letter contained instructions to have the papers properly executed, recorded and returned, and for Shryock to have possession of, with authority to pay Nichols, $1,678.72, with interest from said August 9. The letter also stated: "While we have no reason at all to question Mr. Eaton's financial responsibility or his ability to complete this residence in accordance with his plans and specifications, and pay all of his obligations incident thereto, still we are depending upon your Company to use the utmost care and caution in the disbursement of your first loan proceeds to determine that this money is actually spent in the payment of bills for material and labor used in the construction of improvements *which are now being built* on this property, *and for no other purpose.*" The Nichols-Eaton warranty deed to Lot Three was made subject to claims for labor and materials and its covenants of warranty restricted the same as in the Nichols-Eaton warrant deed to Lot Four. It was dated August 8 and recorded August 14, 1929. Under date of August 9, 1929, recorded August 14, 1929, Maud Eaton and R. N. Eaton executed a first deed of trust conveying said Lot Three to Fidelity National Bank & Trust Company, as trustee, with said Prudential as beneficiary, to secure their several negotiable promissory notes aggregating $15,000, said deed of trust containing the usual covenants of warranty; and a deed of trust, subject to said Prudential deed of trust, conveying said lot to Samuel D. Newkirk, as trustee, with Elizabeth Deighan as beneficiary, to secure their negotiable promissory note for $2,422.09. They, the Eatons, also executed on August 9, 1929, a completion bond to Elizabeth Dieghan covering Lot Three in the same sum and containing the same recitals as the completion bond given in connection with Lot Four. On August 14, 1929, Shryock issued its check for $1,680.12 to Nichols to cover the $1,678.72 mentioned in the Nichols-Shryock letter of August 9, and also its check for $4,000 payable to R. N. Eaton, which Eaton endorsed for deposit to the credit of Fidelity.

Elizabeth Dieghan was a "straw" for Nichols, had no real interest in the transactions, and Nichols was the real owner of the second deeds of trust.

The improvements on Lots Three and Four were finished in December, 1929.

Nichols carried these transactions on its books in the name of the Fidelity and Fidelity carried the property on its books as an asset in the name of Maud Eaton. R. N. Eaton testified Maud Eaton had no interest in the property; that he had general charge of the business of Fidelity; that he made contracts for materials for the buildings; that the construction of buildings was the general business of Fidelity and that the claims of the lienors were correct as to amounts; that one Brown was in the employ of Fidelity. Fred H.

Brown testified he was employed by Fidelity; and that he worked under Mr. Eaton's instructions and purchased materials for the improvements here involved in the name of Fidelity. Arthur Fels, president of Fels corporation, testified his recollection was that Fels agreed to make the loan from plans and blueprints submitted by Eaton; that he had no knowledge of but conceded a building was in process of construction at the time of the execution of the Fels deed of trust, and that the first payment under this loan to Eaton by Fels was Fels' check of May 17, 1929, for $2,500. It appears that such moneys as R. N. Eaton received under the loans were applied to the credit of Fidelity.

Grant I. Rosenzweig had transacted business with Fels for a number of years, sometimes as customer for mortgages for himself and clients and sometimes as attorney. On February 21, 1930, the Rosenzweigs purchased said $15,000 Eaton-Fels notes, said notes being endorsed in blank without recourse, paying therefor full face value and received from Fels the papers, including a title certificate, excepting mechanic liens not of record, dated April 24, 1929. Preparatory to said purchase, Mr. Rosenzweig went out to inspect the property. He found the improvements new, "completed, apparently completed, for some months, and unoccupied;" but did not go inside. He inquired of a Fels' representative if there were any outstanding lien claims and was informed so far as they knew and believed all bills had been paid.

Subsequent to said February 21st, liens were filed for record against said property. The Eatons became financially involved and a conference of parties interested in the financial difficulties of the Eatons was called. Mr. Rosenzweig testified he was of opinion this conference was in May, 1930, and that "Mr. Fels notified me to be there and I went."

Thereafter, Maud Eaton and R. N. Eaton were adjudged bankrupt, scheduled the obligations herein mentioned, and in due course received their discharge in bankruptcy. Fidelity's charter was forfeited, and R. N. Eaton, Maud Eaton, L. V. Knapp and E. M. Chester, as trustees, represented said Fidelity corporation in this litigation.

The $15,000 Fels deed of trust was foreclosed January 7, 1932, and the Rosenzweigs, as husband and wife, acquired the title to Lot Four.

The Prudential deed of trust was foreclosed and by trustee's deed, recorded August 24, 1933, the Prudential Insurance Company acquired title to Lot Three.

Lee & Boutell Company, a corporation, asserting a lien against Lot Four, instituted this proceeding. The owners, record and equitable, of the fee to said Lots Three and Four, the trustees and beneficiaries under the several deeds of trust, including Nichols Investment Company, a corporation, and, among other parties, the fol-

lowing lienors (corporate entities unless otherwise indicated), in the development of the proceedings, were made defendants: C. A. Brockett Cement Company, Arthur Garney, doing business as Garney Plumbing and Heating Company; Rust Sash & Door Company; Henry Seufert and Charles L. Seufert, copartners doing business as Seufert Bros. Hardware Company; Cook Paint & Varnish Company; United Brick & Tile Company; Henry R. Lewis, an individual; Weatherproof Products Company; Kansas City Light and Fixture Company; Helen C. Johnson, John J. Lewis and Henry R. Lewis, copartners doing business as S. C. Johnson & Son; E. E. Miller, an individual; Badger Lumber and Coal Company; Stewart Sand Company.

I. The Lee & Boutell Company's (hereinafter designated Lee) petition asserted a lien against Lot Four only. The cross-petition of Badger Lumber and Coal Company (hereinafter designated Badger) asserted separate liens against Lot Four in count one and against Lot Three in count two. Prudential, the only appellant interested in Lot Three, contends the second count of the Badger answer is not germane to plaintiff's petition, is not a proper cross-petition under the statutes, conferred no jurisdiction over Lot Three and the decree is void as to said Lot. Badger states the general rule is as contended by Prudential [see 21 C. J. 508, sec. 613; Fulton v. Fisher, 239 Mo. 116, 128(1), 143 S. W. 438, 441(1), and other cases] and Prudential's position to be well taken if this be all there was to the issue; but contends the peculiar provisions of the mechanics' lien law takes the issue, under the facts of the instant case, out of the general rule. The issue arose in this manner:

The Lee petition, filed May 17, 1930, joined, among others, S. C. Johnson & Son and Kansas City Light & Fixture Company (hereinafter designated Johnson and Kansas City, respectively) as defendants. Stewart Sand Company (hereinafter designated Stewart) filed its lien account May 19, 1930. On motion alleging Stewart had a blanket lien against said Lots Three and Four, Stewart was made defendant May 29, 1930. Johnson, Kansas City and Stewart held and in their respective cross-petitions asserted and prayed for blanket liens against said Lots Three and Four. The Badger cross-petition was filed subsequent to the Johnson and Stewart cross-petitions. A number of other lien claims were asserted against Lot Three. However, all, with the exception of Badger, having settled, dismissed as to Lot Three at the trial, Prudential settling with Stewart as to Lot Three with the approval of the Rosenzweigs on or about July 2, 1931.

Section 3189, Revised Statutes 1929 (Mo. Stat. Ann., p. 5015), provides that "when the improvement consists of . . . separate buildings on contiguous lots . . . erected under one general con-

tract, it shall not be necessary to file a separate lien upon each building or lot for the work done or material furnished in the erection of such improvements.'' The Lee petition was under Section 3180, Revised Statutes 1929 (Mo. Stat. Ann., p. 5008). Said section provides for the adjudication, determination and enforcement of mechanics' liens and the rights of all parties (owners and others) interested in the property and any of the property in one action, which action is denominated an equitable action for the purposes aforesaid and for the purposes of marshaling, applying and distributing the proceeds of the sale of any such property. Section 3181, Revised Statutes 1929 (Mo. Stat. Ann., p. 5010), states who are necessary and proper parties; provides that lien claimants whose rights are not disclosed by the proper record at the time of the institution of the equitable action are bound by the proceedings, orders and judgments therein, but are entitled upon application before final disposition to be made a party thereto, and that any person whose rights are disclosed by the record not made a party may be made a party upon application or by the court on its own motion. Section 3183, Revised Statutes 1929 (Mo. Stat. Ann., p. 5012), provides that after the institution of such equitable action other mechanics' lien suits shall be stayed and no separate suit shall be brought ''. . . but the rights of all persons shall be adjusted, adjudicated and enforced in such equitable suit'' against said property, or any of it. By Section 3186, Revised Statutes 1929 (Mo. Stat. Ann., p. 5014), any such equitable action is made the exclusive remedy ''for the enforcement of mechanics' liens. . . . And the procedure in such equitable action *except as herein otherwise provided,* shall be governed by the law and the rules of procedure in civil actions generally.''

We are here concerned with the rights of mechanics' lien claimants against the property, rights in the instant case arising from, existing by virtue of and asserted under statutory enactment only. [Fleming-G. C. Co. v. McGonigle (Mo.), 89 S. W. (2d) 15, 18 (2).] Under the statutes each lienor became vested with an original cause of action for the establishment of his lien claim. The statutory provisions authorizing the equitable proceedings were enacted not as a limitation upon the statutory rights thereby vested in lienors but primarily for the prevention of that vexation of an owner and others interested in the property arising from defending a multiplicity of suits and for the stated adjustment, adjudication and enforcement of the rights of all persons in and to the property in one action. Such equitable action is made the ''exclusive'' remedy [Sec. 3186] and subsequent suits for the establishment of any mechanics' liens against the property are expressly prohibited [Sec. 3183]. The cross-petitions (we are not speaking of answers) of lienors in such actions, seeking the establishment of such lienor's original cause of action, partake of all the attributes of an original petition to that

end. They differ from the usual cross-petition in equity in that the gist of a lienor's cross-petition is not the defeat of the rights asserted in the original petition but the assertion of such cross-petitioner's lien rights against the property, and to that extent only are the rights of the original petitioner affected by the cross-petition, if at all, and, if so, then only incidentally and within the restrictions placed upon mechanics' liens by the statutes creating such liens. Had lienor Johnson, Kansas City or Stewart [Secs. 3189, 3180] instituted the equitable action for the establishment of a blanket lien claim against Lots Three and Four, lienors having separate liens against said lots or either of them, as well as other lienors holding blanket liens against both of said lots, would have been proper parties to any such action. The case presents no issue involving the bona fides of the blanket mechanics' liens or any inequitable allocation of such claims resulting from the settlements had. Section 3180 contemplates the marshaling, applying and distribution of the proceeds derived from a sale of the property among the various claimants that full and complete justice be accorded each. [See Fleming-G. C. Co. v. McGonigle, supra.] Where, in equitable proceedings, all lienors are compelled to assert their claims in one proceeding, to hold, in such a proceeding, that blanket lienors might recover the whole of their lien claims against one of several separate but contiguous lots, as contended by Prudential, without any attempt to equitably adjust the rights of the lien claimants in and to the respective lots might well result in unjustly depriving the lienor having a claim only against one lot of equities to which he is lawfully entitled; especially so if thereby the other lots are relieved of the discharge of their just share of said blanket lien claim to the unjust advantage of the mutual debtor of said lienors. Such holding would be contrary to the spirit and letter of the statute, which contemplates the marshaling, applying and distribution of the proceeds of a sale of the property among the parties. What would have been Prudential's position had the shoe pinched Prudential's financial foot and all the blanket lienors sought satisfaction against Lot Three only? Under such circumstances the rights of lienors and the jurisdiction of chancery over the *res* should not rest upon the precarious result of a race to the circuit clerk's office; but such jurisdiction should expand with the exigencies of the situation as presented and disclosed to the court by the petitions (be they original or cross-petitions) of lienors for the protection of the rights of all lienors (and others as well), giving to cross-petitions for this purpose that consideration accorded the original petition. [See Waters v. Gallemore (Mo. App.), 41 S. W. (2d) 870, 883(9).] Nor are we fearful, as is Prudential, that the carrying of the foregoing ruling to its logical conclusion would involve insurmountable difficulties beyond the far reaching and protecting arm of a court of equity to administer full and complete justice when a number of

lots and blanket and separate liens are involved. The greater the difficulties encountered or the intricacies of the issue involved, the greater the delight of equity in administering well rounded justice.

■ II. One of the underlying contentions presented by appellants is that their respective deeds of trusts are prior and superior to the claims of the lienors against the respective lots and improvements.

A number of points under appellants Rosenzweigs' "points and authorities" bear upon the issue, some stating abstract propositions of law with which we are in full accord. For instance, the principle of law stated in Joplin C. Co. v. Greene County B. & L. Co., 228 Mo. App. 883, 885 et seq., 74 S. W. (2d) 250, 251 et seq. (citing cases), to the effect that liens having their foundation in construction work commenced by a vendee holding a contract of purchase are subordinate to such vendee's subsequent deed of trust in the amount its proceeds are applied to the discharge of the purchase price when such construction was commenced without the knowledge and consent (authority) of the vendor.

Section 3178, Revised Statutes 1929 (Mo. Stat. Ann., p. 5006), provides ". . . all cestui que trust, for whose immediate use, enjoyment or benefit any building, erection or improvements shall be made, shall be included by the words 'owner or proprietor' thereof under this article [the mechanics' lien law]." The holder of an equitable, as well as the holder of the legal, title to the land is recognized as possessing such ownership or proprietorship therein as to subject his interest to claims of lienors under said article. [Sawyer-A. L. Co. v. Clark, 172 Mo. 588, 596, 73 S. W. 137, 139; Short v. Stephens, 92 Mo. App. 151; Magill L. Co. v. Carter (Mo. App.), 17 S. W. (2d) 581, 584(4); Julius Seidel L. Co. v. Hydraulic Co. (Mo. App.), 288 S. W. 979, 981(4); Westport L. Co. v. Harris, 131 Mo. App. 94, 103, 110 S. W. 609, 611; Jodd v. Duncan, 9 Mo. App. 417, 420.]

In Lyvers v. Rutherford (Mo. App.), 80 S. W. (2d) 729, 733(7), certain property was owned by Robert Lungstras and others. It was placed with Raymond M. Henley, a realtor, for sale. J. R. Rutherford and Henley agreed upon the terms of a sale, and Henley told J. F. Rutherford to proceed with certain repairs to make the house habitable for winter. J. F. Rutherford started the carpenter work about August 15, 1928. Lungstras et al. conveyed the property by deed dated September 10, 1928, to Sterling P. Rutherford, J. F. Rutherford having the title put in his son's name for convenience, and Sterling P. executed a deed of trust back to secure $9,500 representing part purchase money. J. P. contracted with plaintiffs for a heating plant, and plaintiffs began furnishing materials September 11, and thereafter the deed and deed of trust were recorded. Lungstras was

beneficiary in the deed of trust and contended the purchase-money deed of trust took priority over the mechanics' lien. The court considered, from the terms of the deed of trust, that the trustee and beneficiary contemplated and had in mind the improvements; that Rutherford might not pay for the same; and that they undertook to protect themselves against such contingencies by the provisions of the deed of trust; found the equities with lienors; and held the lien claim superior to the purchase-money deed of trust both as to the improvements and the land. In Waters v. Gallemore (Mo. App.), 41 S. W. (2d) 870, 873(7, 8), one Holloway placed a deed in blank in escrow for one McAfee, who had authority to fill in the blank. McAfee sold to Cecil R. Gallemore, who was placed in possession and authorized to take up the deed. Gallemore commenced the construction of improvements May 10, 1929, which was not finished until September 25, or later. June 26 Gallemore paid the consideration, took up the deed, did not insert the name of the grantee, but secured quitclaim deeds from Holloway conveying the title to Anna Belle Gallemore, his wife. June 27, the Gallemores executed a deed of trust on the property to A. L. Friesz, trustee for R. V. Bartow, to secure $1,000. The quitclaim deeds and deeds of trust were recorded. In holding the lien claims superior to the deeds of trust, the court said: ''The court properly found that Cecil R. Gallemore was the owner within the meaning of the law. . . . He was the equitable owner and exercised all the rights of a proprietor in the land at the time the contracts were made and at all times thereafter. . . . The grantee [Anna Belle Gallemore] in the quitclaim deeds, if she received any title at all, took same subject to all equities outstanding against her husband.'' See McGray L. Co. v. Standard C. Co. (Mo. App.), 285 S. W. 104, 107(7) (stating, where a purchasing husband had title conveyed to himself and wife: ''If the improvements commenced while McCue was the owner of the property, plaintiff [lienor] was not bound to take notice of any subsequent conveyance of the property''); Dierks & S. L. Co. v. Runnalls (Mo. App.), 54 S. W. (2d) 447, 448(1).

Materialmen and mechanics furnishing material or labor in the construction of the improvements in December, 1929, come in *pari passu* with materialmen and mechanics furnishing material and performing labor prior to the consummation of the Nichols-Eaton-Fels transaction in April, 1929. [Secs. 3163, 3179; R. S. 1929, Mo. Stat. Ann., pp. 4993, 5007; Schroeter Hdw. Co. v. Croation S. G. Assn., 332 Mo. 440, 449, 58 S. W. (2d) 995, 1002(15), citing cases; Gardner v. North K. C. A. M. (Mo. App.), 61 S. W. (2d) 374, 376(3), citing cases; Waters v. Gallemore, 41 S. W. (2d) 870, 873(6).]

The record in the instant case discloses Nichols as record owner up to April 23, 1929, and Maud Eaton as record owner up to January 7, 1932. On October 22, 1928, Nichols ''sold'' and agreed

to convey said Lots Three and Four to Fidelity. Nichols received the $1,578.11, whether from assets acquired by Fidelity for value or by gift is immaterial. Nichols admits its receipt from Fidelity in kind. Fels did not pay it. Under the terms of the contract the time for its consummation lapsed prior to April, 1929; but Fidelity, rightfully or wrongfully, entered into possession of Lot Four and commenced construction on April 5, 1929. Nichols, conforming to Fidelity instructions, conveyed to Maud Eaton under date of April 18. Construction, begun by Fidelity on April 5th, continued without interruption until completion in December, 1929. That Nichols, Fidelity and Maud Eaton had in mind and contemplated the very improvements in question is evidenced by the Nichols-Fidelity contract of October 22, containing provisions with reference to the size, cost, etc., of any residence erected on said lot; the Nichols-Eaton deed conveying the lot subject to any and all claims for labor or materials or labor and materials furnished in the construction of the improvements and reserving from the warranty the exceptions noted; the Nichols-Fels letter advising Fels Nichols was looking to Fels to exercise the utmost care in the application of Fels' first loan proceeds to the payment of bills for labor and materials, no doubt a factor in Nichols' willingness to accept the note and second deed of trust for its unpaid purchase money; the Eaton-Fels deed of trust obligating the Eatons to promptly and fully complete any improvements contemplated to be paid by moneys secured by said deed of trust and pay and prevent the filing of any claims for mechanics' liens against said improvements and subrogating Fels to any lien paid out of funds provided under said deed of trust, the Eaton-Dieghan deed of trust (the property of Nichols) being subject to said Eaton-Fels deed of trust; the Eaton-Dieghan completion bond expressly reciting that *the construction of a residence had begun on said Lot* and was to be fully completed by *November 1, 1929,* according to plans and specifications theretofore approved, and conditioned upon the payment of all indebtedness incurred for labor and materials used in such construction "in order that there be no mechanics' lien claims." There is no evidence that Nichols repudiated the Nichols-Fidelity contract of October 22. Whether or not it be a justifiable inference that Fidelity was in possession of Lot Four and proceeding under said contract, as modified by mutual consent; from the Nichols-Eaton deed and the Eaton-Dieghan deed of trust Maud Eaton recognized her deed and Nichols recognized the Nichols-Eaton deed and its deed of trust as subordinate to lien claims incurred in connection with the improvements in progress, and considering the Nichols-Fidelity-Eaton transaction as a whole, it is apparent they ratified, as of the date of the transfer of Lot Four, the obligations of Fidelity creating liens against said lot for the improvements here involved. Such ratification was tantamount to previous authority. Nor is Fels in any better posi-

tion. In consummated the Nichols-Eaton transaction. Engaged in making real estate loans, it had sufficient notice from the recitals in the Nichols-Eaton deed and the Nichols-Fels letter to put a prudent man on inquiry as to existing lien claims. It admittedly made the Eaton loan, secured by the Eaton-Fels deed of trust, from blue prints, and by express terms in its deed of trust required that the improvements be promptly and fully completed, and was authorized to pay and become subrogated to any lien claims discharged out of the proceeds of said loan. It must have realized that Nichols was taking a deed of trust to secure purchase-price money subordinate to its deed of trust that the improvements might proceed. If the Eaton-Fels completion bond was similar to the Eaton-Dieghan completion bond, as Rosenzweigs' brief states these bonds were similar, it knew the improvements were in the course of construction and were to be completed by November 1, 1929. If its deed of trust was superior to the lien claims, why the provision in its completion bond (as abstracted) that the obligors save it harmless from any and all mechanics' liens, pertaining to the improvements, in addition to counsel fees for defending lien suits? Irrespective of actual knowledge of the construction work then in progress, it was charged, in law, with notice thereof. [McAdow v. Sturdevant, 41 Mo. App. 220, 227, 228, and cases; Fleming-G. C. Co. v. McGonigle (Mo.), 89 S. W. (2d) 15, 19, 20; for the theory of the rule see Shroeter Bros. Hdwe. Co. v. Croation S. G. Co., 332 Mo. 440, 459, 58 S. W. (2d) 995, 1003.]

We think it clear that the Nichols-Eaton-Fels transaction was consummated by the parties on the understanding that the Maud Eaton record title and the Nichols and Fels deeds of trust were subordinate to the claims of materialmen and mechanics for the improvements here involved. [See Lyvers v. Rutherford, supra; Masterson v. Roberts, 336 Mo. 158, 162(1), 78 S. W. (2d) 856, 858(2).]

Grant I. Rosenzweig acted for himself and wife in the acquisition of the Eaton-Fels deed of trust. The provisions hereinbefore discussed of the Nichols-Eaton deed and the Nichols-Fels deed of trust were in his chain of title and he is charged with constructive notice thereof. [Black v. Banks, 327 Mo. 341, 349, 37 S. W. (2d) 594, 598(6); Mahen v. Tavern Rock, 327 Mo. 391, 396, 37 S. W. (2d) 562, 564(7).] Rosenzweig is an attorney, versed in real estate law. He testified he received the papers from Fels, including the title company's certificate dated April 24, 1929. The Rosenzweigs purchased February 21, 1930. If he received the Eaton-Fels indemnity bond he had additional notice of the possibility of lien claims. He *went out to* inspect the property and realized the improvements were new. Construction work was not completed until on or about December 27, 1929. McAdow v. Sturdevant, supra, states: ''This fact [construction work in progress] gave notice to all the world. This

notice is imparted by the commencement of the building as well as by any later contribution to the structure." Such notice to be effective for the protection of lienors must carry with it their attending statutory rights to file the lien accounts and otherwise proceed in accord with Article 3, Chapter 25, Revised Statutes 1929. Rosenzweigs were charged with notice that a building was in process of construction on said Lot Four in December, 1929. The time had not expired for the filing of lien claims against the property when they purchased the Eaton-Fels deed of trust on February 21, 1930. Answering respondents' contention that appellants were required to investigate for lien claims against Nichols, Rosenzweigs admit they were obligated to look for liens under Nichols and Maud Eaton because Nichols and Eaton were in their chain of title. They seemingly recognize that the Nichols and Eaton titles and the Eaton-Fels deed of trust might have been subordinate to lien claims incurred in the construction of the improvements here involved. The record discloses no inquiry by Rosenzweig of Nichols or Maud Eaton. His inquiry of Fels was not such inquiry as he admits he was under obligation to make. Fels was not constructing the improvements and the statement of its representative that he knew of no liens was not a statement that liens did not exist. Rosenzweigs were charged with notice of sufficient facts to put a prudent man, layman or attorney, upon inquiry. [Sensenderfer v. Kemp, 83 Mo. 581, 580; Beach v. Lynn, 299 Mo. 127, 140, 252 S. W. 437, 441(4) (stating: "If by due constructive notice, or by actual notice, the proposed purchaser of property is advised of a state of facts which would place a prudent person upon inquiry as to the title he is about to purchase, such person is not an innocent purchaser"); Maupin v. Emmons, 47 Mo. 304, 307 (quoting Speck v. Riggin, 40 Mo. 405: "Notice is actual where the purchaser either knows of the existence of the adverse claim or title, or is conscious of having the means of knowing, although he may not use them")].

We summarize some findings warranted by the evidence: Fidelity was acting through its president, R. N. Eaton. Maud Eaton held the record title for the use and benefit of Fidelity, holder of the equitable estate. Maud Eaton was approving, confirming and ratifying all that Fidelity or her husband, R. N. Eaton, on behalf of Fidelity, were doing in the construction of the improvements. Fidelity and Maud Eaton were proceeding on the theory the record title, as well as the equitable estate, would be subject to the claims of respondents for liens. R. N. Eaton had sufficient authority to subject the equitable estate of Fidelity and the record title of Maud Eaton to lien claims for the improvements here involved. We are not concerned with personal judgments covering lien accounts. All parties to the Nichols-Eaton-Fels transaction had in mind the improvements here involved and that the Fels deed of trust was sub-

ordinate to any lien claims for improvements in the process of construction at the time of the consummation of said transaction. Rosenzweigs were not innocent purchasers of the Fels deed of trust. No contention is presented that any additional construction costs were incurred on account of construction by Fidelity or that any of the improvements were not within the improvements contemplated. The lien accounts are correct as to dates, amounts and descriptions of property and lienors relied on their lien rights against the property.

We do not hold that lienors who contract with an equitable nonrecord owner stand upon the same basis as lienors or others contracting with the record owner. All deal with strangers to the record title at their peril. The cases demonstrate mechanics and materialmen must exercise proper care in entering into construction contracts; and they may well be held to suffer the results of lax business transactions and forfeit lien rights to one who exercises due caution in subsequently acquiring property subject to their claims. However, we do not have such a case before us. The Rosenzweigs voluntarily purchased the Fels deed of trust subsequent to the lien claims attaching to the property, and could have ascertained upon proper inquiry, so far as disclosed by the record, the facts. Our holding is that the equities in the instant case favor the lienors.

The applicable foregoing observations are to be considered in connection with the Nichols-Eaton-Prudential transaction and the status of the Prudential deed of trust, and, with the observations hereinafter made under paragraph V, dispose of the issues presented by Prudential's appeal.

III. A number of the accounts proceed upon the theory Fidelity was the contractor and equitable owner. Others, however, make no mention of Fidelity. The Garney account, for instance, states the owners and contractors were R. N. Eaton and Maud Eaton. The requirement of said Section 3161 of a statement in the lien account of ". . . the name of the owner or contractor, or both," is conditioned as follows: "if known to the person filing the lien." Giving the lien statutes that reasonably liberal construction to which they are entitled for the accomplishment of the purposes of the law and the preservation of lien claims, within the scope of the law, against mere technical attacks, we are of opinion lienors' accounts show such substantial compliance with the statutory requirements as to fairly apprise the appellants of the demands asserted against the property therein described and are sufficient.

IV. The Garney cross-petition, however, alleged that Maud Eaton held the record title for Fidelity as real owner and that his contract was with Fidelity. The Rosenzweigs contend variances of this nature between the petition and the lien account are fatal. We think it proper for a lien claimant upon definitely ascertaining the

true facts after filing his lien account to allege the true facts in his petition; and, with the parties proceeding as they proceeded in the instant case, think it would be inequitable to defeat the lien claims of some of the respondents on account of the variance between the statements in the lien accounts and the petitions seeking the establishment of their respective liens [See Dierks & Sons L. Co. v. Runnals (Mo. App.), 54 S. W. (2d) 447, 448(2); St. Louis C. P. M. Co. v. Walker (Mo. App.), 64 S. W. (2d) 131, 133(3)] upon the attack of one deemed not legally prejudiced thereby.

V. Nor do we think the liens of some respondents are to be defeated because their petitions alleged they contracted with Maud Eaton and Fidelity or Maud Eaton, Fidelity and R. N. Eaton. The contracts, if joint, would be construed as joint and several [Sec. 2953, R. S. 1929 (Mo. Stat. Ann., p. 1820)], with lienors privileged to prosecute their claims against any one or more of the joint obligors [Sec. 2956, R. S. 1929 (Mo. Stat. Ann., p. 1823); Sec. 703, R. S. 1929 (Mo. Stat. Ann., p. 915], and in the event such lienors failed to prove all defendants were parties to the contract, they would still be entitled to have judgment against such defendant or defendants, if any, shown liable. [Sec. 961, R. S. 1929 (Mo. Stat. Ann., p. 1234); Bagnell T. Co. v. Missouri, K. & T. Ry. Co., 242 Mo. 11, 20, 145 S. W. 469, 471(2); Stanley v. Whitlow, 181 Mo. App. 461, 465, 168 S. W. 840, 841(6).]

VI. Lienors contracting with Fidelity or Maud Eaton, or the agent of either of said parties, were original contractors, privileged to file their lien accounts within six months after the accrual of the indebtedness [Sec. 3161, R. S. 1929 (Mo. Stat. Ann., p. 4986); Reinhardt v. Crescent B. & L. Co., 56 Mo. App. 493; Magill L. Co. v. Carter (Mo. App.), 17 S. W. (2d) 581, 584(4).]; and entitled to their liens against the property whether they proceeded upon the theory that Maud Eaton was the owner of the property or upon the theory that Fidelity was equitable owner and Maud Eaton held the record title for the use and benefit of Fidelity.

These rulings, of course, are based upon the peculiar facts of the instant case and the position of the party presenting the issue.

The Rosenzweigs original brief presents assignments of error in nineteen paragraphs, followed by "points and authorities" in the total of thirty. Many are abstract statements of law, unaccompanied by an attempt to apply them to specified facts or to point out wherein the rights of any specified one or more of the fourteen respondents were adjudicated in violation of such rule of law. This may account for the failure of some respondents to discuss certain matters in their brief; and, with other alleged matters, has resulted in several separate motions to dismiss for failure to comply with our rules.

Rosenzweigs' appeal involves more details for proper presentation than appellants usually encounter. However, our rules are made for observance that the work of the court be expedited. After some labor which might have been avoided through a better compliance with our rules and giving consideration to all issues sufficiently preserved for appellate review and deemed essential, including possibly some issues not sufficiently preserved, we overrule the several motions to dismiss and affirm the decree *nisi*, holding the claims of the mechanics and materialmen prior and superior liens to the respective deeds of trust both as to the improvements and the land. *Cooley* and *Westhues, CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.

MOTIONS FOR REHEARING AND TO TRANSFER.

PER CURIAM:—Prudential and the Rosenzweigs filed separate motions for rehearing. Prudential also requested a transfer to court en banc.

Rosenzweigs' motion is founded upon the provisions of Sections 3039, 3041 (recording statutes), and 3155 (equitable liens and notice thereof), Revised Statutes 1929 (Mo. Stat. Ann., pp. 1879, 1880, 4970). Specific reference to these statutes is not made in the decision; but the decision finds the Rosenzweigs were charged with notice of sufficient facts to put a prudent person upon inquiry (notice being actual within the meaning of Section 3041, supra, where one is conscious of having the means of knowing, although he may not use them—cases cited on issue in opinion). The Rosenzweigs admitted they were obligated to look for liens under Nichols and Maud Eaton because Nichols and Eaton were in their chain of title. The record disclosed no inquiry of Nichols or Maud Eaton. We concluded, under all the facts, that the equities in the case favored the lienors. We did not rule that a duty rests upon a purchaser to ferret out all possible equitable claims.

The motions for rehearing and the motion to transfer are overruled.