DAVIS ESTATE, a Corporation, v. WEST CLAYTON REALTY COMPANY ET AL., Defendants, MYERS CONSTRUCTION COMPANY, a Corporation, Appellant.—89 S. W. (2d) 22.

Division One, December 18, 1935.

*Albert Chandler* for appellant.

*Nagel, Kirby, Orrick & Shepley* and *Harry W. Kroeger* for respondent.

FERGUSON, C.—The plaintiff, Davis Estate, a corporation, owned a 193-acre tract of unimproved land in St. Louis County, partly within the corporate limits of University City and partly within the corporate limits of the city of Clayton. The Davis Estate entered into a contract for the sale of this tract to the West Clayton Realty Company, a corporation, hereinafter referred to as the realty company. The terms of the contract will later be set out. The realty company made certain payments on the purchase price and went into possession of the land under the contract; the Davis Estate, however, retained the title to secure the payment of the remainder of the purchase price and the performance by the realty company of the contract. The realty company did some grading and employed the Myers Construction Company, a corporation (hereinafter referred to as the construction company), to install a sewer line on a part of the land. The realty company made some payments to the construction company on its account for installation of the sewer but a balance remains unpaid. The realty company defaulted upon its contract of purchase with the Davis Estate and continuing in default the Davis Estate brought this suit in equity against the realty company seeking to enforce its vendor's lien and foreclose the equitable title and interest of the realty company in the land. Whereupon, leave of court being first had, the construction company filed an intervening petition to have the court find and declare it entitled to an equitable lien against the land for the unpaid balance of slightly more than $15,000 of its charge for the sewer installation, declare such lien prior to plaintiff's lien and enforce same. The cause was tried in the Circuit Court of St. Louis County, the realty company making default. The chancellor found against the construction company, dismissed its bill and entered a decree in favor of plaintiff foreclosing the equitable title and interest of the realty company in the land. The construction company has appealed.

The written contract between the Davis Estate corporation and the realty company for the sale and purchase of the land was dated July 7, 1925. The contract provides that the purchase price of $564,000 be paid as follows: $1000 at the signing thereof; $4000 on the "closing of the sale;" $165,000 in serial installments over a period of twenty months from the date of the "closing of the sale" and the balance on or before five years after the date of the "closing of the sale." Taxes were to be adjusted as of the date of the "closing of the sale" and the purchaser was to pay all taxes "thereafter." The sale was to be "closed" on or before August 1, 1925, subject to a reasonable ex-

tension of time in the event of title objections, which did not materialize. Upon "closing the sale" the Davis Estate was required to, and did, deposit a general warranty deed conveying the land to the purchaser, in escrow, with the St. Louis Union Trust Company (who is made a party defendant in this suit) and the purchaser, the realty company, was required to, and did, pay the sum of $4000 on the purchase price, mentioned above, and deposit a "purchase money deed of trust," securing the payment of the purchase price installments, in escrow, with the trust company. Delivery of the warranty deed to the realty company was to be made upon the payment by it of $50,000 on the purchase price together with "the interest accrued" to that date "on the part purchase money deed of trust," interest thereafter to be paid "at six months intervals." The contract then provides:

"On the payment of Fifty Thousand Dollars ($50,000.00) on said purchase price, the purchaser or assigns will prepare and execute a plat of subdivision mutually satisfactory to the purchaser and the seller, and the seller will cause the holder of the purchase money Deed of Trust to join therein, dedicating and releasing from said Deed of Trust all alleys, streets, parkways and easements shown on the plat of subdivision of the aforesaid Tract No. 1 to be filed of record in St. Louis County, Missouri, and after a further payment of Fifty Thousand Dollars ($50,000.00) bringing the credit on said purchase to One Hundred Thousand Dollars ($100,000.00) like action shall be had as to the aforesaid Tract No. 2, but after closing the sale and before said payment, grading shall be permitted.

"The purchaser will be permitted to make improvements on said Tract No. 1, when the first Fifty Thousand Dollars ($50,000.00) is paid on said purchase price and on Tract No. 2, when a further Fifty Thousand Dollars ($50,000.00) is paid, making a total of One Hundred Thousand Dollars ($100,000.00) paid on said purchase price.

"The purchaser or assigns will provide two (2) bonds in the sum of Fifty Thousand Dollars ($50,000.00) each, one (1) on each tract, suitable to the Trustee, to insure that improvements which will include grading, will be commenced within eight (8) months of the date of closing and to protect the property against liens and will maintain said bonds until the final completion and full payment for said improvements on said tracts, which improvements will include five foot (5) granitoid walks, sewers, concrete, asphalt or oil penetration macadam streets (excepting Ladue and Old Bonhomme Road which shall be improved with granitoid walks) gas and water mains and electric service lines in streets or rear easements for each lot, which agreed improvements shall be recited in contracts for the sale of the respective lots in said subdivision. . . .

"It is mutually agreed that the purchaser and assigns shall be

entitled to release any lot in the aforesaid subdivision from the lien of the purchase money Deed of Trust upon payment to the holder thereof in the sum of Twenty Dollars ($20.00) per front foot and interest on said amounts to the date of payment. Such payments to be credited on the principal note secured by said deed of trust and the interest to be decreased proportionately, all costs of said releases to be borne by the purchaser and assigns.''

The sale was ''closed on or about August 1, 1925,'' at which time pursuant to the terms of the contract the Davis Estate deposited a warranty deed, dated August 1, 1925, conveying title to the land to the realty company, in escrow, with the trust company and on the same date the realty company made the additional payment of $4000 on the purchase price and executed notes for the deferred installments of the purchase price, payable to the Davis Estate, and the ''purchase money deed of trust,'' wherein the trust company was made trustee, securing same. The notes and deed of trust were also deposited, in escrow, with the trust company. The aggregate of all the payments made by the realty company was $56,225. These payments were applied and treated as credits on the amount which, under the contract, was to be paid before the warranty deed in escrow was to be delivered and as the realty company never made payments which at any time aggregated the sum of $50,000 plus interest it was not entitled, under the contract, to delivery of the warranty deed. Therefore the title remained in the Davis Estate and the continued default of the realty company in the payment of principal, interest and taxes, becoming due from time to time, resulted in the filing of this suit, on November 25, 1931, to foreclose any and all equitable interest or title which the realty company might have in the land by virtue of the contract of July 7, 1925, between it and the Davis Estate. It will also be noted that the realty company never at any time paid an aggregate of $50,000 on the principal of the purchase price. This is mentioned as bearing upon the provisions of the contract quoted, supra. Nor does it appear that any subdivision plat was ever prepared or submitted to the Davis Estate or that any lots were sold and the Davis Estate called upon to release same. The last payment by the realty company in the amount of $1000, which was credited upon unpaid interest, was made June 16, 1927. It was conceded at the trial that the realty company was insolvent and that situation seems to have existed for some time prior thereto also the land project contemplated by its purchase under the contract herein seems to have been abandoned by the realty company long prior to the filing of this suit. However reverting in point of time to August 1, 1925, the recognized date of ''the closing of the sale,'' the realty company at or about that time went into possession of the land and shortly thereafter did some grading on the land, the extent of which

is not disclosed but is not material to the issues involved in this appeal. The realty company employed the intervener, construction company, to install a line of sewer "through a ravine on the land." The sewer was completed in December, 1925, the total charge therefor being $16,046. The realty company paid thereon at intervals, the last payment being made in October, 1928, and in varying amounts from $250 to $1000, an aggregate of $5000. In its intervening petition filed January 13, 1932, the construction company alleges the account as follows: principal $11,046; interest $4,184; total $15,230. The contract pursuant to which the construction company did this work was made in October, 1925. It was an oral agreement between John B. Myers, president of the construction company, and Everett Davis, president of the realty company. We digress here to observe that Everett Davis was in no way related to or connected with the members of the Davis family interested in the plaintiff corporation. We next quote at some length from the testimony of Myers, president of the construction company, concerning the agreement and the events now relied upon as the basis of a so called equitable lien against this land.

"Q. With whom did you deal with reference to the installation of the sewers? A. With Mr. Davis—the Realty Company. Mr. Everett Davis is the one that ordered us to do the work.

"Q. When did you first confer with Mr. Everett Davis about it? A. In October, 1925.

"Q. What was said by Mr. Everett Davis to you or by you to him at that time? A. There wasn't anything in particular said. I think, in the conversation, I probably asked him if he had the money to pay for it and he said he had. I fixed up my prices with Mr. Pitzman, who represented him as an engineer and with one of Mr. Pitzman's men, Mr. George; and then I went to Mr. Davis and said, 'Here is the price that Mr. George says is the right price' and he said, 'If that is satisfactory to them it is perfectly satisfactory to me.'

"Q. Did you say anything to Mr. Davis with reference to payment for the sewer? A. I asked him at that time if he had the money to pay for it and he said he had.

"Q. Was the sewer to be paid for immediately upon completion, or did you give credit to the West Clayton Realty Company for any length of time? A. The agreement was that we were to be paid when it was completed. He said he had the money to pay us for doing it.

"Q. And nothing else was said about payment in those conferences with Mr. Davis other than what you have related? A. No.

"Q. Did you, at the time of these conversations with Mr. Davis, ask him for any protection or security for the payment of the cost of installation of the sewer? A. No, sir.

"Q. Did you have any conversations with Mr. Davis about the sewer after the conversation in which he asked you to make the installation and told you he had the money to pay for it? A. I had no further conversation with him about the sewer.'

"Q. Did you confer with anyone else who acted on behalf of the West Clayton Realty Company in connection with the arrangements for that installation? A. No, I didn't.

"Q. The only negotiations that you had with reference to that installation were the negotiations you had with Mr. Everett Davis? A. That's all.

"Q. Was there any correspondence between you and the West Clayton Realty Company with respect to this installation? A. No, sir.

"Q. Was any other officer of your company concerned with the making of that contract? A. No.

"Q. Did Mr. Davis represent to you that he owned the property? A. He told me he owned the property; he said there was a syndicate of owners and that he had the money.

"Q. Did he say anything to you in respect to the terms on which he bought it? A. No.

"Q. Did he state to you whether or not he had the legal title to the property? A. No.

"Q. Did you make any investigation to ascertain whether the West Clayton Realty Company was the owner of the property at the time this installation was made  A. No.

"Q. Did you make any effort to collect the unpaid balance for sewer installation after October 10, 1928 (date of last payment)? A. Yes, I called on Mr. Davis all the time about it and he always gave me some excuse and would say that he hadn't the money yet but he would get it and to be patient.

"Q. Did you ever threaten to bring suit against him? A. No, sir.

"Q. Did you ever approach anyone else but Mr. Everett Davis with respect to obtaining payment for the installation? A. No, sir.

"Q. Did you ever bring suit against Mr. Everett Davis or his company? A. No.

"Q. Are you acquainted with any of the officers of the Davis Estate, the plaintiff in this case? A. No, sir.

"Q. Are you acquainted with Mr. Samuel C. Davis, Mr. Dwight Davis or Mr. John T. Davis? A. No, sir.

"Q. Did you ever have any dealings with any of those gentlemen, that is, Mr. Samuel C. Davis, Mr. Dwight Davis or Mr. John T. Davis in respect to this sewer installation? A. No, sir.

"Q. Did you ever notify any of those gentlemen or notify the Davis Estate that you were making the installation? A. No.

"Q. Did you ever file any notice of record setting forth that you made the installation? A. No, sir.

"Q. Did you ever, in any form, make demand on the Davis Estate, for them to pay for this installation? A. No, sir.

"Q. Have you any reason to believe that the Davis Estate or Mr. Samuel C. Davis, or Mr. Dwight Davis or Mr. John T. Davis knew this installation was made? A. No, I have no reason to know anything about it."

Samuel C. Davis, president of the Davis Estate corporation, testified that he did not know, and had no information to that effect, that the construction company had in 1925 installed the sewer until after this suit was commenced in November, 1931; that "some time" thereafter the attorneys representing plaintiff herein informed him that the construction company was claiming a lien on this land for installation of the sewer in 1925 was the first information he had about the sewer; and that prior thereto he had no information that the realty company had contracted with the construction company for such installation.

The position of the intervener (appellant) herein is that of plaintiff. It seeks affirmative relief. The situation is the same as if it had filed an original and independent suit seeking to have a court of equity declare, establish and enforce an equitable lien in its favor. No conflict in evidence appears and in considering the case here *de novo* we undertake to determine and apply the controlling rules or principles. The evidence shows that the legal record and title was at all times vested in and retained by the Davis Estate; that the construction company installed the sewer on this tract of vacant, unimproved land under an oral contract with the realty company and that there was no stipulation or agreement of any kind for a lien against the land to secure payment for labor or materials nor is it so much as claimed that such lien was intended or contemplated. It is admitted that the installation was made in reliance on the assurance of the president of the realty company that he had the money at hand to pay, and would pay, for same when completed. The officers of the Davis Estate had no notice, knowledge or information of the installation of the sewer in 1925 until after the filing of this suit on November 25, 1931.

Intervener—appellant—says the mechanic's or materialman's statute does not apply and could not have been invoked by it. This is not controverted by respondent. Our mechanic's or materialman's lien statute creates a lien which arises from, and exists by virtue of, statute and not contract. It is immaterial whether a lien was reserved, intended or contemplated if the party who performs work or labor or furnishes material comes within the provisions of the statute a lien arises in his favor which can be established and enforced by compliance with the requirements of statute. "The lien is brought

into operation by virtue of the statute'' and the contract is presumably entered into ''in view of or in reference to, the statute.'' [Van Stone v. Stillwell & Bierce Mfg. Co., 142 U. S. 128.] In this instance the construction company admits that the mechanic's lien statute does not apply and could not have been invoked by it and that no lien was reserved, or stipulated for, by contract or intended and without alleging or showing the existence of any equitable grounds for relief, such as fraud or mistake, it comes into a court of equity and asks that court to create in its favor, and enforce, a lien against the land for labor performed and materials furnished in the installation of the sewer, that is, a lien analogous to the statutory mechanic's lien. But such a lien ''is neither recognized at common law nor allowed in equity.'' It is ''a creature of and dependent on statute.'' [Fleming-Gilchrist Construction Company v. Louise McGonigle, Admrx., 338 Mo. 56, 89 S. W. (2d) 15; and authorities there cited; South Fork Canal Co. v. Gordon, 73 U. S. 561; Van Stone v. Stillwell & Bierce Mfg. Co., 142 U. S. 128; Mellon v. St. Louis Union Trust Co., 225 Fed. 693, 699; Realty Sav. & Inv. Co. v. Washington. Sav. & Bldg. Assn. (Mo. App.), 63 S. W. (2d) 167, 169; Joplin Supply Co. v. West, 149 Mo. App. 78, 90, 130 S. W. 156, 159; 18 R. C. L., p. 872; 40 C. J. 42.] No lien arising by virtue of the statute and none having been provided for or reserved by contract the installation of the sewer was made, as the evidence clearly shows, upon the personal credit of the realty company and the assurance of its president that the realty company had the money and would pay for same when completed.

Authorities cited by appellant announcing the equitable doctrine that where a person in good faith and under mistake as to the condition of the title makes improvements that are permanently beneficial to another's property an equitable lien on the property so benefited arises are not applicable under the facts here for it is not even claimed that the construction company acted in good faith under a mistake of fact as to the title while the owner stood by with full knowledge thereof and permitted the improvement to be made. Fraud is neither charged or shown. This brings us again to the reiterated rule that the mere performance of labor or the furnishing of materials in placing an improvement upon land does not create an equitable lien against the land.

We shall not burden this opinion with a discussion of the numerous cases cited by appellant construing the mechanic's lien statute. Such cases deal only with the statutory lien and the applicability thereof under the facts of the particular case, and lend no support to appellant's theory of an equitable lien. However one contention will be noted, because it is so urgently made, though it is predicated upon the holding of cases construing and applying the

terms of the mechanic's lien statute and therefore not in point here. Appellant says that the sale contract between the realty company and the Davis Estate required the realty company to make certain improvements enumerated therein. That part of the contract upon which appellant relies is set out, supra. It will be noted that the contract provides, that "after closing the sale grading will be permitted;" that upon the payment of "the first $50,000" on the purchase price the realty company "will be permitted to make improvements on tract 1" and permitted to make improvements on tract 2 "when a further $50,000 is paid" on the purchase price. Later certain improvements are specifically mentioned including "sewers." Appellant says a proper construction of subsequent provisions of the contract requires that the realty company immediately commence and make the enumerated improvements. The respondent says that a construction of the contract is not involved but that if appellant's contention in that respect is considered that upon a construction of the contract, as a whole, it will appear that it does not require the realty company to make improvements but only permits it to do so when and after it has complied with the terms of payment set out above which was never done. Our mechanic's lien statute gives a lien to "every mechanic or other person who shall do or perform any work or labor upon, or furnish any material," etc., "for any building, erection or improvements upon land, . . . under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor." In construing this and like statutes it has been held that where a vendee in possession of land under an unexpired contract for the purchase thereof contracts for improvements thereon, which are within the purview of the statute, and the contract for the purchase of the land expressly requires and obligates the vendee to make such improvements the contract constitutes the vendee the "agent" of the vendor, within the meaning of that term as used in the statute, so that the interest or estate of the vendor will be subject to the lien created by the statute. However where the sale or purchase contract merely permits the vendee to make improvements he is not, in doing so, the agent of the vendor, within the meaning of the statute, and does not thereby subject the vendor's estate to the lien. [18 R. C. L., p. 896, sec. 25; 40 C. J., p. 113; O'Leary v. Roe, 45 Mo. App. 567; see, also, Ward v. Nolde, 259 Mo. 285, 168 S. W. 596, and Concrete Engineering Co. v. Grande Bldg. Co. (Mo. App.), 86 S. W. (2d) 595.] Appellant construing the contract of sale in this case to require and obligate the vendee to commence and make the improvements mentioned therein argues, by analogy, that the realty company was thereby constituted the agent of the Davis Estate to make the improvements and in so doing to obligate or bind the Davis Estate by contracts therefor. If inter-

vener's construction of the sale contract be granted and its theory that thereby the realty company acted as the agent of an undisclosed principal, the Davis Estate, accepted, we nevertheless are confronted with the same inescapable proposition that there was no contract for a lien and no lien was reserved or intended; that no grounds for equitable relief or the imposition of an equitable lien, such as fraud or mistake, exist; and that liens for labor performed and materials furnished in the placing of improvements upon real estate are "neither recognized at common law nor allowed in equity" and exist only by virtue of statute. The personal liability, if any, of the Davis Estate on the theory that the realty company was its agent is not an issue in this suit. The construction company made the installation upon personal credit. It did not demand, require, or contemplate security and a court of equity cannot now create a security in its behalf by way of a lien against the land. Following the well-recognized rule the Supreme Court of Kansas in Houston v. Hunt, 96 Kan. 778, 153 Pac. 554, states the matter very clearly and aptly as follows: "The law is well settled that plaintiff is not entitled to *an equitable lien* for the purchase price of materials used in the improvement of real estate. And there is no special reason why a merchant who sells material, as this was sold, should have an equitable lien upon the real estate, any more than that the merchant or farmer who sells feed which is used to fatten live stock should have an equitable lien on the stock." (Italics ours.)

The judgment of the circuit court should be affirmed. It is so ordered. *Hyde* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.