231 S.W.2d 127 (1950)
WELBORN
v.
RIGDON.
No. 41419.
Supreme Court of Missouri, Division No. 1.
June 13, 1950.
Rehearing Denied July 10, 1950.
*128 Ira B. Burns, Cliff Bailey, Kansas City, for appellant.
R. C. Tucker, John Murphy, William H. Wilson, J. Gordon Siddens, Tucker, Murphy, Wilson & Siddens, all of Kansas City, for respondent.
LOZIER, Commissioner.
Appellant (hereinafter referred to as plaintiff) appeals from a judgment dismissing his petition "for want of equity and prematurely brought." The judgment also dismissed the cross-petition of respondent (hereinafter referred to as defendant), but she did not appeal. The amount in dispute exceeds $7500, and title to real estate is involved.
The petition was, substantially: That defendant owned a combined apartment house and drugstore; that on or about June 15, 1947, the parties entered into an oral agreement whereby plaintiff would furnish funds to improve the property and thereafter the property would be sold and the proceeds divided as follows: defendant to have what the property cost her, plaintiff to have the amount of his expenditures and each to have one half of the balance; that certain improvements were made, all by plaintiff, at a total cost to him of $7559.55; that "by virtue of such payments by plaintiff, the defendant thereupon became a trustee for the plaintiff to the extent of" said amount; that defendant had "refused to recognize plaintiff's interest in said property and has entered into a contract for the sale of same all without consultation with plaintiff and with intent to cheat, defraud and deprive him of his aforesaid interest"; and that plaintiff was without remedy at law. The prayer was for "a decree *129 enforcing the said trust, declaring the defendant to be the trustee of said property for the plaintiff to the extent of the aforesaid $7559.55, * * * and that defendant be required to account to the plaintiff for his ratio of the profits * * * and for such other and further relief as the court may deem proper and just."
Defendant's answer asked dismissal of the petition for failure to state a cause of action and grounds for equitable relief, and pleaded laches and the statute of frauds. She admitted ownership of the real estate and then pleaded this cross-action, substantially: That plaintiff made love to her and asked her to marry him, and agreed to improve her property as a gift; that she paid for fixtures he bought and bills he incurred; that he made the improvements without her consent; that on August 2, 1947, she repaid plaintiff the $806 he had expended in consideration of which plaintiff signed a release containing this provision: "I further agree and understand that this release pertains in and to any work and monies which have been or may at any time in the future be spent upon the premises and business * * *. I further understand and agree not to make any claim of any kind whatsoever in the future against the said Betty Rigdon, her heirs, executors or assigns whether such action or causes of action may be claimed to have risen in the past or may arise in the future"; that thereafter plaintiff continued to make love to her, showered her with gifts, told her he would get a divorce and marry her "though by that date it had become known to her" that plaintiff had represented himself as single; that he said he would make no claim against her for his advancements; that all this was a scheme to defraud her; that she objected but he ignored her, called her names and struck her; that without her consent he moved in one of the apartments and refused to vacate or pay rent, assumed the right to manage the drugstore, and took money out of the cash register and refused to account therefor; that his acts jeopardized her business and credit; and that he filed a lis pendens preventing a sale by her of her real estate. Defendant asked affirmative equitable relief, including a prayer that the title be determined.
Plaintiff's answer admitted the filing of the lis pendens and denied the other allegations of the cross-petition.
"This is an equity case and we cannot avoid the duty and responsibility placed upon us to reach our own conclusions as to the weight and value of the evidence. * * * `This rule of deference to the findings of the chancellor * * * is not to be ignored, unless the proof adduced is palpably insufficient to sustain the findings, or there is a strong preponderance of the evidence to show the court should have found to the contrary.'" McCoy v. McCoy, Mo.Sup., 227 S.W.2d 698, 703.
Plaintiff was a real estate dealer. Defendant, apparently a capable business woman, was the owner and manager of the apartments and the drugstore. She occasionally dealt in real estate. The parties became acquainted in 1946, when she inquired about a building he had advertised. Later she listed a building with him. In May, 1947, she asked him to sell the property here involved for a commission. He made no sale.
Prior to August 2, 1947, plaintiff expended $806 in improving the property. He says she "wanted certain things done and I said I would do it and I advanced the money." She says he "began to court her, asked her to marry him and suggested he would like to give her some money for the improvements and would like to work around and help her with the responsibility until they were married." She says he started repairs while she was away (a workman testified that she was present at the start and gave directions during the work); and that he paid a $100 deposit upon a delicatessen box which she later approved but that she had to pay the $920 balance on it.
In any event, defendant "got worried" and consulted an attorney, Mr. Henry Riederer, several times. Riederer testified that he advised her "to dissolve all ties" and drafted the release. On August 2, the two went to Riederer's office. Plaintiff says she did not tell him the purpose of *130 the trip. At the office, Riederer handed the release to plaintiff who signed the release and accepted defendant's check for $806. It was thus, defendant testified, that she concluded her dealings with plaintiff, even though she then "regarded the $806 as a gift" and refunded it reluctantly.
But, she says, "he continued on." That Saturday afternoon, from Riederer's office, they went to the store and, "without her consent or knowledge," plaintiff left at the store her $806 check with the following note: "8/2nd/47 Darling: I am dreadfully sorry to part in this manner I had such a wonderful future planned for us but even though I signed release of everything just as you dictated it & was pleased too do so as I understood this would remove all worries from your mind but you are still undecided therefore I see nothing left too do pleas forgive me for mussing things up I tried hard too straighten everything so as not to decrease your bank account and I am leaving 806.00 in cash too care of check May God bless & keep you is my prayer (Signed) Frank."
Plaintiff had kept in the store safe a folder containing mortgages he owned, on the outside of which was a list of the amounts, totaling somewhere around $24,000 and $27,000. That evening defendant and a store employee read the note and examined the list and "discussed them." The next day, Sunday, defendant received a letter or note from plaintiff advising her in detail how to complete the improvements he had been making "for her sole benefit", and stating his love for her. The letter clearly and unequivocally showed plaintiff's acceptance of the settlement made on Saturday afternoon and of the termination of the business and personal relationships of the parties, stated he hoped to get away from the city for a while but would not leave "until I get the $6500 that I expect this week of which you know about."
Defendant says that, after receiving the note, she telephoned plaintiff and told him to come and get his $806 and his mortgages. Plaintiff says defendant said, "I want to talk to you. If you won't come over to the store I will come to your apartment." That Sunday evening he went to the store. Defendant says that plaintiff promised to get a divorce immediately and then they would be married, and claimed he wanted to continue to do things for her, "and cried and begged and continued to plead with me until I consented to let him go ahead with it." Plaintiff says she asked him to go ahead with the work; and that he said he would upon the terms of the contract alleged in the petition, and that she said that was satisfactory and to go ahead. He gave her the $806 check that night, and she redeposited it in her checking account the next day.
Plaintiff resumed direction of the improvements and repairs. He testified that his total expenditures were $7559.55; that he paid the contractor, Hoff, $3456.27; that he paid for other materials, supplies and labor, $575.10; and that in addition to her $806 check, he gave her $1000 in cash on August 4, and a $1400 check on August 13. Hoff testified that plaintiff paid him $3369.27. Defendant's bank deposit slips corroborated plaintiff as to the $806, $1000 and $1400 items. It is not contended that the improvements and repairs were not made, or that the materials, supplies and labor were not furnished, as stated by plaintiff.
At the trial defendant didn't recall plaintiff giving back the $806 check or giving her $1000 in cash on August 2, denied that he ever gave her any money, denied her endorsement of the $1400 check, didn't recall the deposit of $1400 in her savings account on August 13, or a deposit of $1150 currency and $806 check in her checking account on August 4. However, in her deposition, defendant testified that she took the $806 check and "ran it through her account," and that he had given her cash, including a $1400 check and $1000 in cash, "to defray expenses that he was doing around there." Defendant claims she cashed checks for plaintiff and gave him the cash, but she did not testify that she had done this as to either the $806 or the $1400 check.
Defendant claims that plaintiff incurred a $3383 bill for a fountain, a $333 plumber's bill and a bill practically the same size for electrical work, and $192 for a fence installation, together with other accounts, *131 amounts not stated, which she paid. She reduced the fountain account by paying $151 and turning in her old fountain; and the balance was assumed by the person to whom she later sold the drugstore in April, 1948.
Plaintiff testified (and defendant did not deny) that in October, 1947, the parties had another settlement in the course of which defendant made a list of her expenditures. One night, sometime in November, 1947, defendant took out of the safe the unpaid bills and receipts and other papers affecting the improvements and repairs, including plaintiff's receipts, and took them to her apartment. The next morning plaintiff went to the apartment, demanded the receipts and that she sign a check which he had and, according to defendant, "doubled his fist as if to strike me as he had done so many previous times." She says she ran downstairs, that plaintiff caught her in the store, "grabbed for this bag of receipts, knocked her down and mauled her"; that she ran into the street, "hysterical and excited, ran down the street and in her excitement was tearing up some of the receipts," and that in the street plaintiff "clawed at her." Plaintiff's version is that he asked defendant for the receipts for bills he had paid and a return of the $1400; that she agreed to go to the bank with him and get the money; that she preceded him downstairs and, while in the store, he reached for the sack (in which the bills were and which she was holding in her arms) and grabbed its top; that defendant threw her weight backward and fell, tearing the top off the sack, jumped up, ran into the street and began tearing up the bills. Defendant was corroborated by one witness as to what happened in the apartment and plaintiff by another as to what happened in the store.
Plaintiff says that shortly after August 2, defendant requested him to open the store in the mornings. He tried this for a while but had to get up at 5 a. m. and use taxis in getting there. Then she asked him to move into the store basement until she could get him in one of the apartments. He arose at 5 o'clock and opened the store at 7 and drew no wages. He slept in the basement about 2 weeks and moved into the apartment about August 23. He paid no rent for the apartment which before had brought $30 monthly. However, plaintiff contended that defendant rented the new apartment he built in the basement for $32.50. He denied that she had ever asked him to move. She contends he "just moved in and refused to move." So, too, as to his assisting at the store, he stated and she denied that she requested his assistance.
According to plaintiff, the two together initially discussed the sale of the property with a real estate agent and prospective customers; but later defendant excluded plaintiff from the negotiations which ultimately led to the sale of the drugstore and which were pending as to the sale of the building when the lis pendens was filed. Defendant admitted that she had sold the store business and had "entered into a deal" for the sale of the building and did not deny that she excluded plaintiff from the closing negotiations. Defendant also claimed that the improvements and repairs resulted in a depreciation in the value of the building. In the opinion of a former owner, its value was not increased.
Defendant's contention that plaintiff had paid out large amounts with funds taken out of the cash register was supported only by proof that he had at 6 different times taken amounts totaling $46.50, leaving memos signed "Frank," and also these tabs: $1.55 for "cab," 15¢ for "phone," 60¢, 15¢ and 90¢ for "ice."
As to the "romance," plaintiff stated (and defendant did not specifically deny) that he told defendant the first time he met her that he was married and had a divorce proceeding pending. He also testified that he never proposed marriage as claimed by defendant. Defendant's testimony as to when she first became aware of plaintiff's marital status is vague. She testified that he "made love to her" and asked her to marry him and that she accepted his proposal before she knew he was married; and that she learned he was married a day or so before August 2, and rejected his proposals thereafter. But not once did she state that plaintiff had represented himself to her as a single person. She did not *132 even plead that he represented to her that he was single. One of her witnesses testified that once plaintiff had told her (the witness), but not in defendant's presence, that his wife was dead.
The evidence is clear that plaintiff did tell defendant that he loved her and addressed her in endearing terms. But, so far as the record shows, not once did defendant speak endearingly to plaintiff. She testified that she never professed to love him, but did respect and admire him. She did not reveal to the chancellor when this attitude changed. She told of the many times plaintiff "pulled this love stuff" and of his anger on the occasion of the torn receipts incident. But as to her own emotions, she told only of "getting worried about his incurring bills" and of tearing up the receipts "in her excitement." She pawned no love and affection for either his advancements or his "advances."
In any event, she knew plaintiff's marital status on August 2, and "that is why she went to an attorney." Whatever her motive may have been, she accomplished her avowed purpose of getting plaintiff out of her affairs. She knew what plaintiff had expended up to that time and had her attorney have the release ready for plaintiff's signature. Thus, defendant says, she ended the financial and personal relationship of the parties. Thus, defendant says, did she evict plaintiff from her business and from her heart. But within 36 hours after she had "closed all transactions" with plaintiff, defendant had telephoned him and had resumed dealing with him, and on the following day, possibly within 48 hours after the release was signed, she had deposited in her bank account the $806 check and $1000 cash that plaintiff had handed her.
Upon what basis did the parties deal after their talk that Sunday night? That evening defendant had in her possession a release signed by plaintiff which purported to release not only his advancements prior to August 2, but also any claim "in and to any work and monies which * * * may at any time in the future be spent" upon the building and the store (italics ours). The night before she had "looked at" the list of plaintiff's mortgages and bonds and had observed that they totaled between $24,000 and $27,000. She had her $806 check with the note attached. She had received another note from plaintiff in which plaintiff stated that he expected to receive $6500 within a week. Possibly that night defendant was, as she testified, "no more desirous of going ahead with him than I was in the beginning." But her own evidence clearly shows that she agreed to some sort of arrangement whereby plaintiff was to advance funds to her and make improvements to her property.
Only one of two things could have happened that Sunday night. Either the parties made the oral contract testified to by plaintiff, or defendant merely assented to plaintiff's plea (to the woman he was "courting" and promising to marry if and when he got his divorce) that he be permitted to give her his money. Plaintiff's view that they had made a contract was corroborated by two employees of the store whose testimony as to defendant's admissions (that he had a financial interest) was not controverted by her. One stated that once defendant had told him that she knew she owed the plaintiff money and was going to pay it. The other stated that several times defendant had told her that she (defendant) and plaintiff had a contract and described its terms as those contended for by plaintiff.
Defendant's theory was that plaintiff was giving her the money and paying for the work as a gift. Her own testimony is unconvincing. She was corroborated by one witness who testified that she (the witness) had heard plaintiff tell defendant that the repairs "were not going to cost her anything." This witness was impeached by statements in her deposition that she had not heard the parties discuss their business affairs. In neither of the 2 notes, prior to August 2, did plaintiff say the advancements were gifts, although language was used which could be construed that he intended them to be such. (There was also language that he expected repayment of the $806 check.) But that was before the agreement was reached. In neither of the 2 notes after *133 August 2 was this particular matter referred to.
We may summarize defendant's own evidence in support of her gift theory: "On the night of August 3, I made no contract; I knew he was a married man; I did not love him and was no longer `engaged' to him; I had `gotten him out' the day before; I had his release for future expenditures; he begged so hard I reluctantly took his money and agreed to let him make other advancements gratuitously." Upon all the evidence, defendant clearly failed to sustain her burden, as an alleged donee, of showing, by clear and convincing evidence, that the advancements were gratuities resulting from plaintiff's love and affection, and were not attributable to the contract. 24 Am.Jur. 790, 791; and Miss. Valley Trust Co. v. John F. Weber & Bro. Gro. Co., 347 Mo. 739, 148 S.W.2d 578. The overwhelming weight of the evidence shows that the parties made, not a simple arrangement wholly for defendant's financial benefit, but the oral contract claimed by plaintiff, and we so rule.
We next rule that defendant committed a breach of the contract when she undertook to negotiate the sales without plaintiff's participation. A reasonable construction of the contract is that plaintiff was to have a voice in the sales negotiations. The extent of his reimbursement (and possibly also his share of the balance above the total investments of the two, if any) depended upon the sale price. We need not consider whether or not her denial of the existence of the contract or her declared intention not to reimburse plaintiff (in any amount) was a breach by anticipatory repudiation. See Wahl v. Cunningham, 320 Mo. 57, 6 S.W.2d 576, 67 A.L.R. 489, and Puckett v. National Annuity Ass'n, 134 Mo.App. 501, 114 S.W. 1039. We do not say that he was entitled to set the sale price, but he was certainly entitled to participate in the negotiations, which he had apparently initiated, for the sale of the building.
Such findings make these issues: Is the oral contract unenforceable; if enforceable, is plaintiff entitled to an equitable lien; and if not entitled to such lien, is he entitled to other relief, equitable or legal?
In her answer defendant pleaded the Statute of Frauds, Sec. 3354, both Mo. R.S.1939, and Mo.R.S.A. The agreement did not purport to be, and obviously was not, one under which defendant agreed to pay or assume the debt of another. Plaintiff was charging defendant upon her own debt. Wahl v. Cunningham, supra, and Diehr v. Carey, 238 Mo.App. 889, 191 S.W. 2d 296. Nor was it one in consideration of marriage. It was not made in contemplation of expected marriage or in consideration of "promised marriage," (defendant's term) because plaintiff's promise was void and without consideration (8 Am.Jur. 848) and defendant had rejected even that promise. 11 C.J.S., Breach of Marriage Promise, § 2, p. 772; Restatement, Contracts, Sec. 588, and Wilbur v. Johnson, 58 Mo. 600. Nor was it one "not to be performed within one year," 37 C.J.S., Frauds, Statute of § 50, p. 558; See v. See, Mo.Sup., 237 S.W. 795; and McGuire v. Hutchison, Mo. App., 210 S.W.2d 521. Had plaintiff been single, his promise was not within the one year clause. 129 A.L.R. 546. And if it was, plaintiff had fully performed. See Bird v. Bilby, 202 Mo.App. 212, 215 S.W. 909; Schlitz Brewing Co. v. Mo. Poultry and Game Co., 287 Mo. 400, 229 S.W. 813; and Blue Valley Creamery Co. v. Consol. Products Co., 8 Cir., 81 F.2d 182. Nor is it one for the sale of land or an interest in or concerning land. The contract did not purport to transfer to plaintiff (or anyone else) any legal or equitable title to or possessory right in the property. It was one merely for the division of the proceeds from a sale of land owned by one party. 37 C.J.S., Frauds, Statute of, § 119, p. 614.
The agreement created no express trust. There was no resulting trust as defendant had acquired the property prior to becoming acquainted with plaintiff. None of his funds were used in the purchase of the property. A resulting trust "must result or arise from facts which occur `at the time of or anterior to' the execution of the conveyance by which the title passes and `cannot be created by subsequent occurrences.'" *134 Parker v. Blakeley, 338 Mo. 1189, 93 S.W. 2d 981, 988. Compare Cordia v. Connolly, Mo.App., 261 S.W. 729. Nor was there a constructive trust. Defendant, the title holder, was under no legal or equitable duty to hold for or convey to plaintiff any portion of the title. See Pomeroy's Eq. Juris., 5th Ed., Vol. 4, Secs. 1238 ff. Without commenting upon the propriety or impropriety of defendant's motives or her actions between that Saturday noon and that Sunday night, we rule that plaintiff's charges of fraud on the part of the defendant were not proven and that there was not sufficient evidence of fraud to justify the imposition of a constructive trust. The contract created only a debtor-creditor relationship. Wheat v. Platte City Ben. Ass. Sp. Rd. Dist., 227 Mo.App. 869, 59 S.W.2d 88.
Nor is plaintiff entitled to an equitable lien upon the property. The agreement did not purport to make the property security for plaintiff's advancements. The absence of such intent, and the fact that plaintiff knew the state of the title, are fatal to plaintiff's claim of equitable lien. 53 C.J.S., Liens, § 4, pp. 840, 846; 33 Am. Jur. 429, 431. See also Davis Estate v. West Clayton Realty Co., 338 Mo. 69, 89 S.W.2d 22; and Martin v. Tucker, 217 Minn. 104, 14 N.W.2d 105. With two exceptions, in the cases cited by plaintiff, equitable liens were considered upon either of these two bases or the action was at law for money had and received. Smith v. Smith, 125 N.Y. 224, 26 N.E. 259, is distinguishable in that the one making improvements was held to have been the equitable owner of the fee before the improvements were made. Westport Lmbr. Co. v. Harris, 131 Mo.App. 94, 110 S.W. 609, involving a statutory mechanic's lien, lends some support to plaintiff's position. However, the principle there applied has not been generally approved. Furthermore, there the contract between the owner and the one constructing the building gave the latter the right to sell the property upon his own terms, including fixing the sale price, the owner having no voice in the negotiations and being obligated to execute the deed upon the other's demand.
We find that neither party had unclean hands. We are not impressed with defendant's contention that plaintiff's were dirty because he spoke endearingly to her. The "love stuff" (her language) continued long after she knew plaintiff was a married man and, apparently, it was not objectionable to her until the occasion of the destruction of the receipts. Whatever may be thought of his infatuation, he did not misrepresent his marital status, and the existence of the contract negatives his alleged fraudulent intent. Plaintiff may have been blinded by love, but defendant's eyes were open. But we do not say that defendant's hands were unclean. So far as the record discloses, she made no misrepresentations to plaintiff. The receipts she destroyed were evidence of his advancements and of his rights and her liabilities under the contract, and her destruction of this evidence was an admission of plaintiff's claim. Gaugh v. Gaugh, 321 Mo. 414, 11 S.W.2d 729. We view her act as an attempt to avoid her obligations under contract, wrongful but not fraudulent.
Both plaintiff's action and defendant's cross-action were in equity. Each charged the other with fraud and each sought affirmative equitable relief. The chancellor dismissed defendant's cross-action and we have found that plaintiff did not act fraudulently. Neither party is entitled to relief in equity.
Plaintiff asserted a claim for his advancements to defendant and for his expenditures under the contract. Evidence relating thereto was given by both parties. Having found that there was a contract and that defendant committed a breach thereof, we rule that plaintiff is entitled to relief at law. But this court cannot grant such relief since the record does not sustain the equitable claims upon which equity's initial assumption of jurisdiction was based. We can, however, remand the case for determination of plaintiff's legal remedies. Krummenacher v. Western Auto Sup. Co., Mo. Sup., 217 S.W.2d 473, and Jensen v. Wilson Twp., Gentry County, 346 Mo. 1199, 145 S.W.2d 372.
*135 The cause is therefore remanded in order that the rights and liabilities of the respective parties under the contract and the defendant's breach thereof may be asserted, by proper pleading and proof, and may be determined at law.
VAN OSDOL and ASCHEMEYER, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.