James Paul MUSE and Marie L. Muse,
Plaintiffs-Appellants,

v.

Ruth Brown WOYNER and Charles
Woyner, Defendants-Respondents.

No. 13929.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 17, 1985.

William E. Gladden, Houston, for plaintiffs-appellants.

Jon S. Hutcheson, Houston, for defendants-respondents.

FLANIGAN, Judge.

Plaintiffs James Paul Muse and Marie Muse sued their daughter, defendant Ruth Brown Woyner, and her husband, defendant Charles Woyner. Count I of the petition, directed only against Ruth, alleged that plaintiffs paid Ruth $14,550 for the remodeling of a house located on land owned by Ruth in Texas County. The money was paid while plaintiffs were making their home with Ruth. The prayer of Count I was that the court declare a resulting trust in favor of plaintiffs and that the court impose an equitable lien on the land in their favor.

Ruth's answer to Count I denied most of the material allegations of the petition and also pleaded the Statute of Frauds, § 432.-010,[1] as an affirmative defense.

Count II of the petition, directed only against defendant Charles Woyner, sought $1,000 for the unpaid purchase price of a horse, with saddles and tack, which plaintiffs allegedly had sold Woyner.

The answer of defendant Charles Woyner denied all of the allegations of Count II of the petition and further alleged that

"any sums, if any, owed to plaintiffs by defendant has previously been paid to plaintiffs."

The trial court, sitting without a jury, found in favor of defendant Ruth on Count I and in favor of defendant Woyner on Count II. Neither side invoked Rule 73.-01(a)(2) by requesting a statement of the grounds for the court's decision or its findings on specified controverted fact issues and the court made none. Plaintiffs appeal.

Plaintiffs' first two points challenge the trial court's finding in favor of Ruth on Count I and will be considered together. Plaintiffs' first point is that the trial court erred in failing to find that a resulting trust arose in plaintiffs' favor on Ruth's land to the extent of the amount of money advanced by plaintiffs for the remodeling. Plaintiffs' second point is that the trial court erred in not awarding plaintiffs an equitable lien on Ruth's land to the same extent.

In 1978 plaintiffs moved to Missouri from Mississippi where they had previously resided. Later that year Ruth and her then husband and their two children moved to Missouri. In December 1978 Ruth and her then husband obtained title to the land in dispute. After their divorce in April 1980 Ruth became the sole owner of the land.

In August 1980 plaintiff James Paul Muse began to have heart trouble and, around October 1, 1980, he and his wife moved in with Ruth, a registered nurse.

Ruth testified that before her parents moved in she had decided to do some remodeling of the house. On October 17, 1980, Ruth borrowed some money from a savings and loan association to finance the remodeling she originally planned. That remodeling was completed around December 1, 1980.

Between December 1980, and April 1981, the parents gave Ruth checks for addition-

---

1. All references to statutes are to RSMo 1978, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

al remodeling, the remodeling here in dispute. There were five checks totalling $14,550.

James Paul Muse testified that when he and his wife decided to move in with Ruth, they first offered to buy five acres from her. According to him, Ruth said that she was willing to sell him the land but said, "Why not take (sic) the money and just move in the house with me and the kids?" He testified that the improvements paid for by the $14,550 included a sitting room and a bedroom for the parents and a barn.

James Paul Muse also testified that before the five checks were given to Ruth, he and his wife had an agreement with Ruth. The agreement was "that we furnish the money for the improvements, that we would have a place to live as long as I lived, or as my wife lived, and if at any time we moved out or the property was sold, that we would be reimbursed in full, for the money that we spent on the improvements."

Marie Muse testified that before the five checks were given to Ruth the parents and Ruth agreed orally that the parents "would get our money back" if the land was sold or if the parents no longer lived there.

Marie Muse further testified that in April 1981 Ruth "put the agreement in writing but it was never typed up, notarized or recorded.... There was a written agreement which Ruth wrote in my presence at the dining room table on a stenographer's pad, a little promissory ... Ruth was going to take it and have it typed up and notarized but it was never carried out.... I am not sure that Ruth actually signed that little note but she read it over and we looked it over and worded it, etc., but I never saw it again after that day." Ruth did not deny that occurrence.

James D. Muse, son of the plaintiffs and brother of Ruth, testified that in December 1980 he visited Ruth and his parents in Missouri while the improvements "were going on." According to the witness, Ruth told him that she had made an agreement with her parents to repay the money they advanced for the improvements if the par-

ents moved away or if the land had to be sold.

Later in the trial, plaintiffs' counsel, in cross-examining Ruth, asked her if such a conversation had taken place between her and her brother and Ruth's equivocal response was, "Not to my recollection, no."

The witness further testified that some time later, after his parents had moved from Ruth's land and Ruth also had moved from it, he telephoned Ruth "to reaffirm that she was going to repay my parents the money they had invested in the house.... Ruth told me that she thought $14,500 was a little bit too much but she would pay them $10,000 at the sale of the house."

Testifying in her own behalf, Ruth testified that she had received $14,550 from the plaintiffs but only about $10,000 of that went into the improvements. The rest, she said, was used for routine daily living expenses. After the remodeling originally planned by Ruth had been completed, Ruth said that she had a talk with her parents who were then living with her. The parents wanted an additional room, a dining room, a carport and a barn for her father's three horses. Ruth said she told her parents that she could not afford any further remodeling at that time.

Ruth testified, "Several days passed and I came home from work one night and they presented me with a check saying they wanted to help out, that if money was the reason I could not go ahead and do these things they wanted to give me the money. They used the word 'give.' There was no discussion at all at this meeting or prior to this meeting that this was a loan nor was there any agreement to pay the money back. There was no agreement that the money would be repaid if the house was sold or if my parents should leave the property."

Ruth testified that she and Woyner started dating in the fall of 1981, long after all remodeling had been completed. In November 1981 Ruth told the plaintiffs that she was going to marry Woyner but "I did not give them any definite time." In Janu-

ary 1982 the parents moved out of Ruth's house and returned to Mississippi.

Ruth and Woyner were married on June 19, 1982. The record shows that the plaintiffs did not approve of Ruth's relationship with Woyner. At the trial Ruth introduced several letters written to her by her mother. In one of those letters the mother said, "[Woyner] ran us off but we are not running any further." In another letter the mother said, "We are in desperate need of the money we invested with you.... A stranger was allowed to come in and uproot our whole family." In still another letter the mother referred to Ruth's "adulterous and sinful living."

Plaintiff James Paul Muse testified that in December 1981, "when we moved out," he had a conversation with Woyner who was "living on the property." Muse testified: "I owned a Tennessee walking horse named Golden. I had a talk with Woyner about him purchasing the horse. I told Woyner I would have to come back after the horse. Woyner said he would like to buy the horse and I said, 'I will take $1,000 for the horse and the saddles—the bridle and tack.' Woyner said he would do it. Woyner said that was good, he would give it. He did not pay me at the time and has not. I left the horse with him."

In March 1982 Ruth and Woyner, not yet married, visited the plaintiffs in their home in Mississippi. Sylvia Dooley, plaintiffs' daughter and Ruth's sister, testified that she had a conversation with Ruth at that time in which Ruth said that "when they sold [Woyner's] house they would be repaying Mother and Daddy their money that they had invested."

On March 30, 1982, Ruth, having returned to Missouri from the visit to Mississippi, wrote her parents. That letter, plaintiffs' Exhibit 6, read in part:

[Woyner] and I have set the date for our marriage. It is June 26.... Enclosed you will find a check hope this will help out some and start to pay some of what I owe you. Things have been so tight around here. —By the way—did you pay Lee Kirkwood for the lumber in the barn? on the porch? I've got a bill from him and I'm not sure what it's for—his son dropped it off here one night; I haven't talked to Lee.

In April 1982, according to plaintiff James Paul Muse, he first asked Ruth to return the money which the parents advanced.

On May 3, 1982, Ruth mailed her parents in Mississippi her check in the amount of $500 payable to the parents. The check bore the handwritten notation, "on amt. owed."

The record is not clear with respect to whether the check mentioned in Exhibit 6 was the $500 check dated May 3, 1982. The parents testified that Ruth sent them the $500 check, that that check "had nothing to do with the improvements on the real estate," and that they "applied the check to hay which we had purchased and left in the barn."

Ruth testified that the May 3, 1982, check of $500 was "for the money on the horse." Her testimony, which is somewhat confused, seemed to be that she "miswrote the check for $50 first," apparently referring to the check referred to in plaintiffs' Exhibit 6. Ruth said that the $50 check was "later returned," and then she wrote the $500 check for the horse.

On June 19, 1982, Ruth married Woyner. None of Ruth's family attended the wedding. In October 1982 the parents brought a horse trailer to Ruth's house, stayed one night, loaded "everything" into the trailer and left the next day.

In 1983, according to Ruth, she started receiving letters from her mother demanding payment of the debt.

On August 25, 1983, Ruth wrote the following letter, defendants' Exhibit K, to her father:

Paul Muse
Jackson, Ms.

At this time I have decided to put up for sale the horse "Golden." I am offering you first option of purchase of the horse, saddle and bridle for $500.00.

If you decide to purchase the animal contact me within 5 days of this letter. You will be responsible for the cost of transporting the horse and any fees incurred by the sales transaction.

In the event you fail to institute the option I have given you the horse will be offered for sale to the general public.

Sincerely,

Ruthie Woyner

During cross-examination of Ruth by plaintiffs' counsel, the following testimony was elicited:

Q. Okay. This letter [plaintiffs' Exhibit 6], after it says, "Enclosed you will find a check," which I would like for you to read along with me here. "Hope this will help out some, and start to pay some of what I owe you."

A. Right.

Q. What are you referring to there?

A. To the money they wanted for the horse.

Q. I thought that you had paid for the horse, $500.

A. They were also asking—they were asking $1,000 for the horse.

Q. Are you telling the court that you agreed to pay $1,000 for the horse?

A. That was their asking price.

Q. You didn't agree to pay that?

A. No.

Q. And your later letter to them indicated that you had felt you had bought that horse for $500, didn't it; isn't that right?

A. Yes.

Q. I'm referring to defendants' Exhibit K.

A. Yes.

Q. So, you had—in your position, as stated by your letter, defendants' Exhibit K, was that you had purchased this horse and paid them $500.

A. That's right.

Q. All right. So, are you telling the court—do you have any other explanation of what you're referring to in that letter when you say, "start to pay some of what I owe you?"

A. No.

Woyner testified that the horse was later sold on some unnamed date, that he did not know the name of the person who bought the horse because "Ruth took care of that." Ruth admitted that she sold the horse.

Plaintiffs instituted this action in January 1984.

Plaintiffs' first point is that the trial court erred in failing to find a resulting trust in plaintiffs' favor on Ruth's land to the extent of the money advanced by plaintiffs for remodeling. Ruth acquired title to the land in 1978. Plaintiffs advanced no money for the improvements until December 1980. There was no agreement, antedating Ruth's acquisition of the title, that the parents would pay for remodeling.

■ A resulting trust "must arise from the facts existing at the time title to the land was acquired; and cannot be created subsequently by the expenditure of the claimant's money in improving the property...." *Jacobs v. Jacobs*, 272 S.W.2d 185, 189[11, 12] (Mo.1954). Other authorities, holding that a resulting trust cannot be created by the expenditure of one person's money in improving the property of another where the expenditure was made after legal title has been acquired, include *Coffman v. Coffman*, 414 S.W.2d 308, 312 (Mo.1967); *Hampton v. Niehaus*, 329 S.W.2d 794, 799–800 (Mo.1959); *Wenzelburger v. Wenzelburger*, 296 S.W.2d 163, 166 (Mo.App.1956); Restatement (Second) of Trusts, § 454, Comment o; 89 C.J.S. Trusts § 111, p. 961. Plaintiffs' first point has no merit.

■ Plaintiffs' second point, that the trial court improperly denied them an equitable lien on Ruth's land, is not so easily disposed of because a record which is insufficient to support a finding of resulting trust may suffice to justify the imposition of an equitable lien. E.g. see *Coffman v. Coffman*, supra.

The doctrine of "equitable lien" applies only in cases where the law fails to give relief and justice would suffer without

the equitable remedy, but the doctrine has prescribed boundaries and generally there must be an express agreement, or conduct or dealings of the parties from which an intention may be implied, that some specific property shall be appropriated as security for a debt or obligation before equity will consider that a lien should be declared on the property.... *An equitable lien cannot be based on moral obligations alone but must rest on established equitable principles, and a failure to repay money as agreed, standing alone, is not sufficient reason for equity to intervene to declare an equitable lien....*

*Wilkinson v. Tarwater*, 393 S.W.2d 538, 542[1-3] (Mo.1965) (emphasis added).

■ In a proper case an equitable lien may be imposed in favor of a lender of funds advanced for the improvement of another's property, "if the money is spent on the expected security of the property against which a lien is sought." 51 Am. Jur.2d Liens § 74, p. 173. See 89 A.L.R. 1455 (Equitable lien on real property in favor of one who makes advances or expenditures to improve the same). As the author of that annotation points out, there is a split in authority on whether, in the absence of an intention on the part of the owner to subject the land to, and on the part of the borrower to look to the land as security for, the expenditures made, there may arise in equity a lien in favor of the lender. Some authorities hold that even if such intention exists, such a lien may not be created in the absence of a definite writing evidencing it, or at least of a writing evidencing an agreement to give a lien. See also 53 C.J.S. Liens § 4, p. 847.

The Supreme Court of the United States has said:

A court of equity will not relieve an individual from the operation of the statute of frauds, which requires that interest in lands be created by an instrument of writing, and imposes [impose?] an equitable lien upon land in favor of one who makes improvements thereon, knowing that the title is in another, especially where the money is expended under an express understanding with reference thereto had with the owner, but will leave the party to the remedies, if any, which a court of law provides.

*Washington Market Co. v. District of Columbia*, 172 U.S. 361, 19 S.Ct. 218, 222, 43 L.Ed. 478 (1899).

■ Appellate review of this court-tried case is governed by Rule 73.01 as construed in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). It will be recalled that the trial court made no findings of fact because neither side requested such findings. For the reasons which follow, this court holds that the trial court properly denied plaintiffs the requested relief of equitable lien.

The disposition of plaintiffs' second point is controlled by the principles enunciated in *Welborn v. Rigdon*, 231 S.W.2d 127 (Mo. 1950). There the plaintiff and defendant entered into an oral agreement whereby plaintiff was to furnish funds to improve defendant's real estate, the property was then to be sold and the proceeds divided after each party had deducted the amount each had invested in the property. Plaintiff fully performed by furnishing the funds and the improvements were made. The court held that the statute of frauds, pleaded defensively by the defendant, was no bar to the action because "[t]he contract did not purport to transfer to plaintiff (or anyone else) any legal or equitable title to or possessory right in the property. It was one merely for the division of the proceeds from a sale of land owned by one party." *Welborn*, supra, at 133. It was also true that plaintiff had fully performed.

The court ruled that plaintiff was not entitled to a resulting trust because he furnished the money for the improvements after defendant had acquired the legal title and before the parties became acquainted. The court also said that there was insufficient evidence of fraud to justify the imposition of a constructive trust.

As applicable here, the court said, at p. 134:

The contract created only a debtor-creditor relationship.... Nor is plaintiff entitled to an equitable lien upon the property. The agreement did not purport to make the property security for plaintiff's advancements. *The absence of such intent, and the fact that plaintiff knew the state of the title, are fatal to plaintiff's claim of equitable lien.* (Emphasis added.)

In the case at bar, Ruth testified that there was no agreement of any nature between her and her parents with respect to the $14,550 advanced for the remodeling. Ruth's testimony is not convincing. Nevertheless the trial court properly denied plaintiffs' request for an equitable lien even if plaintiffs' evidence with respect to the existence and content of the oral agreement is accepted. That agreement was that plaintiffs were to be repaid for advancements if they moved from the land or if the land were sold. Only in the latter event would a fund be readily available for that purpose.

In *Welborn* the oral agreement contemplated the sale of the land and a division of the proceeds after the two parties had been reimbursed for their respective investments. Even an oral agreement that definite, which the court found to exist, was insufficient for the imposition of an equitable lien.

Here, as in *Welborn*, the oral agreement, as described by the plaintiffs, "did not purport to make the property security for [plaintiffs'] advancements." Here, as in *Welborn*, the plaintiffs knew the state of the title. The trial court reached the right result, whether or not it accepted plaintiffs' evidence with respect to the oral agreement.

In *Welborn* the supreme court found that plaintiff was not entitled to relief in equity but remanded the cause "in order that the rights and liabilities of the respective parties under the contract and the defendant's breach thereof may be asserted by proper pleading and proof, and may be determined *at law*." *Welborn*, supra, at 135. (Emphasis added.)

■ Where a plaintiff fails to substantiate the theory upon which his case is tried but does show a state of facts which might entitle him to recover if his case were brought upon a different theory, the appellate court, in the exercise of its sound discretion, may remand the cause in order to afford plaintiff the opportunity to amend the petition and to seek a new trial. *Bell v. Green*, 423 S.W.2d 724, 732[12] (Mo. banc 1968); *Nelson v. Grice*, 411 S.W.2d 117, 126 (Mo.1967); *Obermeyer v. Hentschel*, 389 S.W.2d 203, 206[3] (Mo.1965); *Stouse v. Stouse*, 270 S.W.2d 822, 826[1] (Mo.1954). Review of the instant record leads this court to believe that plaintiffs have mistaken their remedy against Ruth and that they should be permitted to litigate their claim against her, under new pleadings, as an action at law based on a debtor-creditor relationship.

■ Plaintiffs' third point is that the trial court erred in denying them relief on Count II which sought, from defendant Charles Woyner, $1,000 for the alleged unpaid purchase price of the horse, saddles and tack. Woyner testified that although plaintiff Muse offered to sell him the horse for $1,000, he did not agree to pay it. He also testified that the horse had been sold and that "Ruth took care of that." Ruth admitted she sold the horse. The trial court was entitled to believe Woyner's testimony and this court sees no reason to interfere with the ruling in favor of Woyner on Count II. On remand plaintiffs, if they so elect, may seek relief against Ruth with respect to the horse transaction.

That portion of the judgment denying plaintiffs relief on Count II is affirmed; with respect to Count I, that portion of the judgment denying plaintiffs the relief of resulting trust and the relief of equitable lien is affirmed but the cause is remanded for such further proceedings, if any, consistent with this opinion.

TITUS, P.J., and GREENE, J., concur.